**In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.**

**PENSION BENEFIT GUARANTY CORPORATION, Petitioner,**

v.

**The LTV CORPORATION, et al., Respondents.**

**PENSION BENEFIT GUARANTY CORPORATION, Plaintiff,**

v.

**The LTV CORPORATION, and LTV Steel Company, Inc., Defendants.**

**Nos. 87 Civ. 6863 (RWS), 87 Civ. 7261 (RWS).**

United States District Court, S.D. New York.

June 22, 1988.

28 H.R.Proc. Pt. 22, 1985 Sess. at 7972 (statement of Rep. Emmons).

Pension Ben. Guar. Corp., Washington, D.C. (Gary M. Ford, Gen. Counsel, Carol Connor Flowe, Deputy Gen. Counsel, Lonie Hassel, Asst. Gen. Counsel, William G. Beyer, Associate Gen. Counsel, Frank McCulloch, Sr. Counsel, Jeanne K. Beck, James J. Armbruster, John Foster and Paula Connelly, of counsel), and Cleary, Gottlieb, Steen & Hamilton, New York City (George Weisz, of counsel), for plaintiff.

Davis, Polk & Wardwell, New York City (Lewis B. Kaden, Karen E. Wagner, Sharon Katz, James Goddard, Douglas Brandon and Joan Greco, of counsel), Levin & Weintraub & Crames, New York City (Michael J. Crames and Herbert S. Edelman, of counsel), and Leboeuf, Lamb, Leiby & Macrae, Washington, D.C. (Frank Cummings, of counsel), for defendants LTV Corp., et al.

Kramer, Levin, Nessen, Kamin & Frankel, New York City (Joel B. Zweibel, Geoffrey M. Kalmus, Michael J. Nassau, Michael J. Dell, Peter V. Pantaleo, Alice A. Thompson, Jeffrey S. Trachtman and Nancy J. Mrazek, of counsel), for LTV Bank Group.

Stroock & Stroock & Lavan, New York City (Lawrence M. Handelsman, Mark A. Speiser, Brian M. Cogan, Lauren G. Klein and Barry M. Sabin, of counsel), for Official Committee of Unsecured Creditors of LTV Corp.

Blank, Rome, Comisky & McCauley, Philadelphia, Pa. (Raymond L. Shapiro, Morris L. Weisberg, Thomas E. Biron, Faith R. Greenfield and Regina Stango Kelbon, of

# 784

counsel), for Subcommittee of Parent Creditors of the Official Committee of Unsecured Creditors of LTV Corp.

Graydon, Head & Ritchey, Cincinnati, Ohio (Eric C. Okerson and Margaret Weingartner Burgin, of counsel), for the Fifth Third Bank.

Hahn Loeser & Parks, Cleveland, Ohio (Lee D. Powar and Lawrence E. Oscar, of counsel), for Huntington Nat. Bank.

Shearman & Sterling, New York City (David J. Mark, of counsel), for Citibank, N.A.

Myerson & Kuhn, New York City (Edgar H. Booth, Claude D. Montgomery, Peter D. Wolfson, Richard Levy, Jr., Janet Shprintz and Sara Chenetz, of counsel), for Official Committee of Equity Security Holders of LTV Corp. and LTV Steel Co., Inc.

Buchanan Ingersoll, P.C., Pittsburgh, Pa. (R.A. King and Kenneth R. Bruce, of counsel), and Mound, Cotton & Wollan, New York City (Stuart Cotton, of counsel), for David H. Miller and William H. Shaffer.

Haynes and Boone, Dallas, Tex. (Robin E. Phelan and Mark X. Mullin, of counsel), for BancTexas Dallas, N.A.

Cohen, Weiss and Simon, New York City (Bruce H. Simon, Richard M. Seltzer and Sophia E. Davis, of counsel), amicus curiae for United Steelworkers of America.

Northeast Ohio Legal Services, Youngstown, Ohio (Staughton Lynd, of counsel), amicus curiae for Solidarity USA, Inc.

Legal Services for the Elderly, New York City (Jonathan A. Weiss, of counsel), amicus curiae for Solidarity USA, Inc.

## TABLE OF CONTENTS

Facts ................................... ——
 LTV's Financial Difficulties and Chapter 11 Filing ..................... ——
 The 1986 Collective Bargaining Agreement ............................ ——
 The PBGC and Title IV of ERISA .... ——
 The PBGC's Involuntary Termination of the Plans .................... ——
 The USWA Lawsuit for Non-Guaranteed Benefits ...................... ——
 The 1987 Interim Collective Bargaining Agreement ................... ——
 Court Approval of the 1987 CBA .... ——
 The Restoration of the Plans ......... ——
 The Notice of Restoration ........... ——
Prior Proceedings in this Court ......... ——
The Stay Application ................... ——
 I. The Automatic Stay ........... ——
 II. The Nature of the PBGC's Claims ...................... ——
 III. Restoration Does Not Violate the Automatic Stay ......... ——
 IV. Section 362(b)(4) of the Code Exempts Restoration ........ ——
The Enforcement Action ............... ——
 V. The Scope of Review ......... ——
 VI. The PBGC's Restoration Authority ..................... ——
 VII. The Restoration Decision was Arbitrary and Capricious ..... ——
 A. The 1987 CBA Plans ....... ——
 B. LTV Steel's Improved Financial Condition ......... ——
 VIII. The PBGC's Procedures Were Inadequate ................. ——
Conclusion ............................ ——

## OPINION

SWEET, District Judge.

The Pension Benefit Guaranty Corporation ("PBGC") has moved pursuant to Fed. R.Civ.P. 56 for an order granting summary judgment directing the LTV Corporation ("LTV") and LTV Steel Company ("LTV Steel") to comply with the PBGC's Notice of Restoration ("Restoration Notice") dated September 22, 1987 and to resume full responsibility for funding and administering three of LTV Steel's four major pension plans, which were terminated on January 12, 1987. LTV, for itself and on behalf of the other debtors and debtors-in-possession in these cases, has moved for an order decreeing and adjudging that the PBGC acted in violation of the automatic stay of section 362 of the Bankruptcy Code (the "Code") and a restraining order of the Bankruptcy Court by issuing the Restoration Notice and thereafter commencing an action to enforce it.

These motions in the context of the facts presented raise difficult and deeply perplexing issues concerning the reorganization of a corporate entity that includes the second largest steel company in the United States, the powers of a public corporation created by Congress to protect the pension benefits of more than 30 million American workers and their families, and the effect of congressionally sanctioned collective bargaining between the United Steelworkers of America ("USWA") and LTV. Underlying these issues is the fundamental

question: what processes and institutions are to be responsible for the casualties suffered by a basic American industry that has been battered by intensive and successful competition from abroad?

No central authority in this litigation has spoken to this bedrock problem. No U.S.A., Inc. has been heard, or even exists. The issues have, therefore, necessarily been parsed in terms of the existing body of bankruptcy, labor and pension benefit law, largely created before the present exigencies existed. The threshold resolution of these competing considerations is, indeed, a daunting task but one assisted by excellence of counsel who have striven with some success to order these complexities. Whatever follows on remand, review or in the halls of Congress, it is this court's initial obligation to find the facts and to reach conclusions by the application of established analysis, where it exists, leading hopefully to the earliest possible resolution of the interests at issue.

The court has reached the following conclusions. First, with respect to the automatic stay, although the PBGC's claims against LTV Steel under Title IV are prepetition claims, restoration *per se* does not effect a recovery on those claims or in any other way constitute an act to possess or to control LTV Steel's assets. Restoration is simply one regulatory component of the federal pension insurance program that protects the nation's employees, and nothing in the Code or in ERISA justifies a debtor's reliance on that program except in cases of severe hardship. Second, with respect to the restoration decision itself, the 1,592 page Administrative Record (the "PBGC Record" or "Record") submitted by the PBGC in this case does not support the PBGC's decision to restore the Plans on any of the asserted grounds. There is no factual or legal basis for the PBGC's finding that LTV has abused the pension termi-

nation insurance program, and the record is not sufficiently developed to permit a finding that LTV Steel's financial condition has improved to the point where it can afford to sponsor its previously terminated plans.

Therefore, LTV's application to enforce the automatic stay by declaring restoration null and void is denied, as is the PBGC's motion for summary judgment. These findings and conclusions are described in the following portions of this opinion which set forth the context of the litigation, its prior proceedings, the issues raised, the resolution of the issues, and the conclusions reached at this stage of the litigation.

*Facts*

*LTV's 1986 Financial Difficulties and Chapter 11 Filing*

LTV is a Delaware corporation active in four basic industries: steel, aircraft products, missiles and electronics and energy products. LTV's subsidiaries include LTV Aerospace and Defense Company, AM General Corporation, LTV Energy Products Company and LTV Steel, the nation's second largest steel operation, which was created by the merger of Jones & Laughlin Steel Company, Youngstown Sheet & Tube Company and Republic Steel Corporation.

Directly and through its subsidiaries, LTV has administered approximately thirty defined benefit pension plans, including the three plans at issue here: [1] the Jones & Laughlin Hourly Pension Plan ("J & L Hourly Plan"); the Jones & Laughlin Retirement Plan ("J & L Salaried Plan"); and the Pension Plan of Republic Steel Corporation Dated and Effective as of March 1, 1950 ("Republic Hourly Plan") (collectively the "Plans"). The Plans are covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Single–Employer Pension Plan Amendment Act of 1986 ("SEPPAA")[2], 29 U.S.C.

---

1. A fourth LTV Steel pension plan, the Republic Salaried Plan, which was terminated involuntarily in September 1986, was not restored by the PBGC.

2. On December 22, 1987 Congress amended Title IV of ERISA with the enactment of the Pension Protection Act of 1987, Subtitle D of

Title IX of the Omnibus Budget Reconciliation Act of 1987 ("OBRA"), Pub.L. No. 100–203, 101 Stat. 1330 (Dec. 22, 1987). Because the Pension Protection Act antedated and, thus, does not apply to the events that give rise to this litigation, the description of ERISA's statutory scheme set forth below does not reflect the 1987

§§ 1301 *et seq.* (1987 Supp.), and are subject to the minimum funding standards in section 302 of ERISA, 29 U.S.C. § 1082, and section 412 of the Internal Revenue Code ("IRC"), 26 U.S.C. § 412.

LTV's intent in acquiring and merging three major steel companies was to combine them, shut down extraneous or outmoded facilities, and emerge with a streamlined, efficient steel company that could survive the extreme financial pressures placed on the steel industry in the late 1970s and early 1980s. The streamlining process resulted in massive lay-offs and premature retirements and corresponding massive pension liabilities. By 1986, LTV Steel had an extraordinary ratio of 77,182 retirees to 24,544 active workers, over 3 to 1.

On July 17, 1986, LTV and substantially all of its active subsidiaries, including LTV Steel, filed petitions for reorganization under Chapter 11 of Title 11 of the Code in the United States Bankruptcy Court for the Southern District of New York, but continued to manage and operate their businesses and properties as debtors-in-possession. The filing of the petitions triggered the automatic stay provisions of section 362 of the Code, and on July 17, the bankruptcy court issued a restraining order enforcing the provisions of the stay.

In connection with its ongoing financial difficulties, LTV Steel had requested in 1985 funding waivers from the Internal Revenue Service ("IRS") for its minimum funding contributions to the Plans for the 1984 plan year.[3] The IRS granted the waiver request, permitting LTV Steel to amortize over 15 years the contribution of more than $170 million due for the 1984 plan year. In 1986 LTV Steel again requested contribution waivers for over $200 million owed to the Plans for the 1985 plan

year and the amount of amortization for the 1984 plan year. The IRS denied that waiver request in November 1986 and revoked LTV Steel's 1984 waiver due to its failure to continue contributions after its Chapter 11 filings. As a result, LTV Steel immediately owed more than $350 million in past unfunded contributions to the Plans for the two years.[4] LTV Steel made some contributions in 1986 to amortize the 1984 waivers, but made no contributions for the 1985 plan year. In addition to LTV Steel's accumulated funding deficiencies, at the time LTV entered Chapter 11, the total present value of LTV Steel's future pension liabilities exceeded $2 billion.

*The 1986 Collective Bargaining Agreement*

On April 1, 1986, a few months before its Chapter 11 filing, LTV Steel had concluded negotiations for a collective bargaining agreement ("1986 CBA") with the USWA. The USWA had agreed to concessions which reduced labor costs by $3.44 per hour. In return, the 1986 CBA provided for an employee profit sharing and stock plan pursuant to a new Employee Investment Program ("1986 EIP") which would be funded with stock in lean years and cash in profitable years. The 1986 CBA included the Jones & Laughlin and the Republic Pension Agreements ("1986 Pension Agreements"), pursuant to which LTV Steel established the J & L Hourly Plan and the Republic Hourly Plan. The 1986 Pension Agreements did not limit LTV Steel's obligation to provide benefits in the event of termination of any pension agreements or termination of the pension plans or any pension trusts. Under the pension agreements, LTV Steel's obligations to fund and pay benefits continue beyond any termination of the agreements themselves.[5]

---

amendments, and all citations to ERISA, as amended by SEPPAA, are to U.S.C. (1987 Supp.), except where expressly noted otherwise.

**3.** Under ERISA, unfunded benefit liability is amortized over time through annual payments by the plan sponsor into the plan. These payments are called minimum funding contributions.

**4.** $175 million of LTV Steel's obligation had been secured by a pledge of stock of LTV's aerospace and defense subsidiary.

**5.** Paragraph 10.2 of both the J & L and the Republic Pension Agreements provides: "Any benefit properly payable pursuant to this Agreement shall continue to be payable, notwithstanding the termination or expiration of this Agreement."

*The PBGC and Title IV of ERISA*

The PBGC is a wholly-owned United States government corporation that was established in section 4002 of ERISA, 29 U.S.C. § 1302, to insure pension benefits under terminated pension plans and to administer and enforce the provisions of Title IV of ERISA which creates a pension plan termination insurance system. The PBGC's regulatory, investigatory and enforcement authority is set forth in sections 4002 and 4003 of ERISA. The PBGC, for example, may adopt such rules and regulations "as may be necessary to carry out the purposes of [Title IV]," 29 U.S.C. § 1302(b)(3), and "may make such investigations as it deems necessary to enforce any provision of [Title IV]," 29 U.S.C. § 1303(a). Moreover, under section 4003(e)(1) of ERISA, the PBGC may bring "[c]ivil actions ... for appropriate relief, legal or equitable or both, to enforce the provisions of [Title IV]." 29 U.S.C. § 1303(e)(1).

Title IV sets forth procedures for the termination of single-employer pension plans by plan administrators, 29 U.S.C. § 1341, or by the PBGC, 29 U.S.C. § 1342, and permits the appointment of the PBGC as the trustee of a terminated plan. *Id.* The statute requires the PBGC to guarantee the payment of nonforfeitable benefits under terminated plans, subject to certain prescribed limitations. *See* 29 U.S.C. §§ 1322, 1322b, 1342. This statutory guarantee is funded primarily by annual insurance premiums paid by the administrators of covered plans. PBGC funds, however, also consist of the amount of employer liability payments collected under section 4062 of ERISA. 29 U.S.C. § 1362; *see also* 29 U.S.C. § 1305.

Section 4062 of ERISA imposes liability on employers whose plans terminate with insufficient assets to pay guaranteed benefits. Such employers are liable to the PBGC for part of the terminated plan's unfunded guaranteed benefits. *See* 29 U.S.C. § 1362(b). Section 4068 of ERISA creates a lien in favor of the PBGC for the amount of its claim under section 4062 which has the priority status of a tax lien under 26 U.S.C. § 6323. *See* 29 U.S.C. § 1368(a), (c). In addition, an employer may be liable to a trust established by the PBGC for plan participants for the outstanding amount of certain unfunded "benefit commitments" that exceed the guaranteed benefits payable by the PBGC. *See* 29 U.S.C. §§ 1342(i), 1362(c), 1349.[6] An employer may also be liable to the PBGC in PBGC's capacity as the statutory trustee of a terminated plan for the plan's accumulated funding deficiencies, for the outstanding balance of waived funding deficiencies, and for the outstanding balance of the amount of previously allowed decreases in the minimum funding standard. *See* 29 U.S.C. § 1362(d).

The Pension Protection Act of 1987 ("PPA") includes amendments to ERISA that enhance the PBGC's rights in several major respects with respect to plans terminated on or after December 27, 1987. For example, the PPA amendments allow the PBGC to perfect a lien upon all of the property of each member of a plan sponsor's "controlled group"[7] for missed minimum funding contributions and make all members responsible for plan funding obligations when due. Prior to these amendments, controlled group liability for certain unfunded benefits became fixed only upon plan termination. The PPA also gives the PBGC the right, upon plan termination, to seek 100% reimbursement from controlled group members for "the total amount of unfunded benefit liabilities." *See* 29 U.S.C. § 1362(b)(1)(A) (1988 Supp.). Previously,

---

**6.** Sections 4042(i), 4062(c) and 4049 of ERISA, 29 U.S.C. §§ 1342(i), 1362(c), 1349, were either repealed or substantially modified by the Pension Protection Act of 1987. A plan administrator's liability to the PBGC for the "total amount of unfunded benefit liabilities" is now governed by section 4062(b)(1)(A) of ERISA. *See* 29 U.S.C. § 1362(b)(1)(A) (1988 Supp.).

**7.** The PPA amendments define "controlled group" to include the plan sponsor and "all other persons under common control" with the sponsor within the meaning of the Internal Revenue Code ("IRC") and Regulations thereunder. *See* 29 U.S.C. § 1301(a)(14) (1988 Supp.). Under the IRC and Regulations, LTV Aerospace and LTV Steel are members of the same controlled group. *See* 26 U.S.C. § 414(b), (c); Treas.Reg. § 11.414(c)–1 through –5.

the PBGC's reimbursement claim upon termination was effectively limited to 75% of the unfunded guaranteed benefits. The PPA amendments do not apply to pension plans, like the Plans at issue here, that were terminated prior to December 17, 1987.

*The PBGC's Involuntary Termination of the Plans*

Because of the Plans' failure to meet ERISA's minimum funding requirements and LTV Steel's precarious financial condition, the PBGC reviewed the Plans' status in December 1986 under ERISA's involuntary termination provisions. The PBGC determined that the Plans were severely underfunded, even though they had sufficient assets to pay benefits then in pay status for several years without additional contributions. The underfunding for guaranteed benefits as of December 1986 was estimated at more than $2 billion. Moreover, the underfunding was expected to increase by an estimated $65 million in 1987 and by an additional $63 million in 1988. The estimated additional cost to the Plans of shutdown benefits was in the range of $300–700 million for more than 6,000 entitled participants.

On December 16, 1986 LTV informed PBGC by letter that "because LTV is currently in reorganization under Chapter 11 of the Bankruptcy Code, LTV cannot and will not make contributions to the Plans to eliminate the accumulated funding deficiencies," and that LTV "does not intend, and is not likely to have the ability, to fund the Plans for future years." Thereafter, on January 12, 1987, PBGC initiated proceedings under section 4042 of ERISA, 29 U.S.C. § 1342, to terminate the Plans and to be appointed statutory trustee, on the grounds that termination was necessary to avoid an unreasonable deterioration of the Plans' financial condition or an unreasonable increase in the liability of the PBGC's insurance funds. LTV, the administrator of the Plans, consented to the terminations. On January 12, this court issued consent orders terminating the Plans effective January 13, 1987 and appointing the PBGC as statutory trustee.[8]

As of the termination date of January 13, 1987, the Plans' assets were insufficient to pay the benefits guaranteed under Title IV of ERISA. Accordingly, PBGC became responsible for paying Plan benefits to the extent of the statutory guarantee in ERISA. *See* 29 U.S.C. § 1322. The PBGC guarantees only nonforfeitable benefits and does not guarantee benefits becoming nonforfeitable solely on account of the plan termination. *Id.;* 29 C.F.R. § 2613.6 (1987). In addition, the PBGC's statutory guaranty does not cover certain amounts and types of benefits that had been provided under the Plans.

Following termination of the Plans, therefore, payments of current pension benefits payable under the 1986 Pension Agreements were reduced to the extent they were not guaranteed by the PBGC. Certain early retirement, disability, and surviving spouse benefits not guaranteed by the PBGC were terminated completely. As a result, more than 7,000 LTV pensioners under the age of 62 immediately had their monthly pensions reduced by as much as $400. Thousands of retirees who were solely dependent on pension benefits for food, clothing, housing and other essentials received substantially reduced pension benefits following termination. Thousands of current employees who had worked in return for a contractually guaranteed right to early retirement thereafter forfeited such benefits and stopped accrual of service for any pension plan. Surviving spouses of employees who died while actively employed also lost certain pension benefits.

*The USWA Lawsuit for Non–Guaranteed Benefits*

In response to the hardship inflicted upon its members by the Plan terminations, on January 16, 1987 the USWA initiated an

---

**8.** *In re Jones & Laughlin Hourly Pension Plan,* No. 87 Civ. 0232 RO (S.D.N.Y. Jan. 12, 1987); *In re Jones & Laughlin Retirement Plan,* No. 87 Civ. 0235 RO (S.D.N.Y. Jan. 12, 1987); *In re Pension Plan of Republic Steel Corporation Dated and Effective as of March 1, 1950,* No. 87 Civ. 0234 RO (S.D.N.Y. Jan. 12, 1987).

adversary proceeding in the bankruptcy court seeking payment under the 1986 Pension Agreements.[9] The USWA lawsuit alleged that LTV Steel's failure to provide the full benefits set forth in the Plans constituted an abrogation of the 1986 CBA and a violation of section 1113 of the Code. The PBGC intervened and opposed the USWA's request that LTV Steel pay the nonguaranteed portion of the benefits, arguing that requiring "the Debtor to continue to pay the prepetition claims of retirees outside of a Chapter 11 plan of reorganization" would be inconsistent with ERISA and "would pervert ... the collection scheme for prepetition debt embodied in the Bankruptcy Code."

The USWA lawsuit represented only one of the measures the USWA was prepared to take against LTV Steel. The USWA had inflicted a damaging strike on the Wheeling–Pittsburgh Steel Company, also a Chapter 11 debtor, for failure to pay pension benefits after its plan termination. At the very beginning of the LTV cases, the USWA had struck Indiana Harbor, LTV Steel's most important facility, in response to LTV's inability to pay certain retiree benefits. Before the strike spread, LTV Steel obtained court authority to pay these benefits. *See In re Chateaugay Corp.,* 64 B.R. 990 (S.D.N.Y.1986). LTV Steel was well aware, therefore, that the USWA could take powerful action to compel the payment of benefits under the 1986 CBA.

*The 1987 Interim Collective Bargaining Agreement*

In an effort to resolve the USWA lawsuit, LTV Steel obtained bankruptcy court approval in April 1987 to make a single hardship payment to each retiree at a cost of $6.7 million and thereafter began negotiating an interim agreement with the USWA. Following weeks of intense bargaining, negotiators for the USWA and LTV Steel reached a tentative agreement on May 13, which was rejected by the local union presidents. Under the threat of a major strike, which LTV Steel estimated would have cost the company $100 million per month, the parties resumed bargaining on May 26. On June 25 the local presidents approved an agreement (the "1987 CBA") which replaced most of the lost (i.e., nonguaranteed) benefits to retirees and created new benefit programs for active workers.

The 1987 CBA is an interim agreement that governs the relationship between LTV Steel and the USWA until confirmation of a plan of reorganization. The 1987 CBA provides that if "any of its provisions become unenforceable" or if PBGC pension payments for guaranteed benefits are not realized on a continuing basis, the 1987 CBA may be terminated, upon notice, by either party and the 1986 CBA will then "snap back" and be in full retroactive and prospective force. It also provides that payments thereunder will offset any equivalent bankruptcy claim against LTV Steel, and will be offset by any equivalent benefit paid by any trust established pursuant to section 4049 of ERISA, 29 U.S.C. § 1349. Further, the 1987 CBA specifically provides that it settles the USWA's suit for retirement benefits.

The 1987 CBA has several major components which together revise certain terms and conditions of employment for LTV Steel's union workers. LTV asserts that three of these components—cost sharing health and life insurance programs, maintenance craft efficiencies, and job elimination—will ultimately generate annual savings to LTV Steel of $50 million. LTV Steel, however, anticipates paying an estimated $70–75 million annually to fund six other components, which comprise the new retirement programs. These new benefit programs are: the Individual Account Trust ("USWA IAT"); the LTV Steel/USWA Pension Plan ("USWA Pension Plan"); the Lump Sum Severance Program; the Pre–Retirement Surviving Spouse Benefit; the

---

**9.** Immediately upon learning of the terminations, the USWA, as an intervenor, moved to vacate the consent orders and obtain an evidentiary hearing on the PBGC's request for a court order approving the terminations. The district court denied the motions to vacate. The USWA appealed and the Court of Appeals for the Second Circuit affirmed the district court's orders. *Jones & Laughlin Hourly Pension Plans v. The LTV Corp.,* 824 F.2d 197 (2d Cir.1987).

Disability Income Benefit Plan; and an Extended Supplemental Unemployment Benefit Plan ("Extended SUB Plan") (collectively, the "1987 CBA Plans").

*Court Approval of the 1987 CBA*

On July 8, 1987, LTV Steel applied to the bankruptcy court for approval of the 1987 CBA. LTV's Senior Vice President and Chief Financial Officer, and LTV Steel's Vice President of Industrial Relations, testified that the interim agreement was necessary to avoid a crippling strike and to permit LTV and LTV Steel to reorganize. In opposition, the Executive Director of the PBGC testified that portions of the new pension programs violated a PBGC policy against post-termination benefit arrangements that constitute, in its view, a *de facto* continuation of previously terminated pension plans. Over the PBGC's objections, the bankruptcy court approved the agreement, exercising its equitable powers under 28 U.S.C. § 157(b) and section 105 of the Code, 11 U.S.C. § 105, to ensure the success of reorganization, stating:

> Based upon the complete record before me today, including all filed papers, it has become abundantly clear that this Court may and should utilize its equitable power to authorize the terms and payments contemplated by the agreements as they are clearly necessary and appropriate to the goal of rehabilitation for this Chapter 11 Debtor.

PBGC Record, p. 622. The bankruptcy court found that the PBGC's claims of ERISA "abuse" or "illegality," which did not address the authority of the bankruptcy court to authorize interim payments, were premature. By orders dated July 30, 1987, the bankruptcy court granted LTV Steel's application in all respects.[10]

Both before and after the bankruptcy court's ruling, the PBGC attempted to stay implementation of the 1987 CBA. The bankruptcy court, this court, and our Court of Appeals, denied the PBGC's applications. Finally, the PBGC appealed the bankruptcy court order approving the interim agreement to this court. LTV Steel moved to dismiss the appeal on the grounds that the July 30 order was only an interim order governing the conduct of the parties during reorganization. In response, the PBGC withdrew its appeal, without prejudice to renewal.

*The Restoration of the Plans*

In August 1987, the PBGC's SEPPAA Trusteeship Working Group (the "SEPPAA Working Group" or "Group"), an administrative group established to provide advice to the agency regarding plan terminations and related matters under Title IV, met to consider restoring the Plans. The Group reviewed the status of LTV Steel's ongoing reorganization, including the establishment of the 1987 CBA pension programs and what it perceived to be LTV Steel's improved financial circumstances. After discussing the purposes of Title IV and the PBGC's duties and obligations thereunder, the Group concluded that the 1987 CBA plans abused the termination insurance program by providing, together with the PBGC's payment of guaranteed benefits, substantially the same benefits as were provided under the terminated Plans. Moreover, in addition to noting significant improvement in LTV Steel's financial situation, the Group noted LTV Steel's agreement to contribute an estimated $90 million to fund benefits pursuant to the 1987 CBA plans and to contribute an additional $90 million in value to the 1986 EIP. The Group also considered actuarial estimates of the minimum funding costs if the Plans were restored.

In addition, the Group considered a financial analysis ("PBGC Summary Financial

---

**10.** In its application, LTV also asked the bankruptcy court for authority to establish similar pension arrangements for non-union salaried employees and retirees in the J & L Salaried Plan, in an Individual Account Trust ("Salaried IAT"). At the same time, but by separate application, LTV asked the bankruptcy court for authority for LTV Steel to make pre-petition stock contributions to the 1986 EIP, the profit sharing and employee stock ownership program covering approximately 27,621 LTV Steel employees that had been established in the 1986 CBA. The USWA had insisted that implementation of the 1986 EIP, which was designed to compensate employees for their economic concessions under the 1986 CBA, was an absolute prerequisite for any USWA concessions for the 1987 CBA.

Analysis") of LTV based on information provided to the Official Committee of Unsecured Creditors which, the Group concluded, indicated that LTV Steel alone would be able to fund the restored Plans in the near future, although the PBGC did not have sufficient data to predict LTV Steel's long-term cash flow with any certainty. In addition, the PBGC Summary Financial Analysis suggested that LTV and the members of its controlled group would generate more than enough cash in the immediate future to support the Plans if restored.

Based on its analysis of LTV's financial condition and on the assumption that LTV Steel would obtain funding waivers from the IRS for the 1984–86 plan years, the Group estimated the total annual funding costs for the Plans upon restoration to be $260 million. The Group then deducted an estimated $90 million in annual funding costs for the 1987 CBA Plans to arrive at an incremental cost of full restoration of $170 million. Based on a further assumption that annual savings of $50 million from negotiated job reductions and other USWA concessions would be realized whether or not the Plans were restored, the Group calculated the net effect of restoration after the job reductions to be somewhat less than $120 million.

Against this estimate of the cost of restoration, the Group weighed LTV Steel's consolidated financial results as forecast in the LTV Corporation and Subsidiaries 87–88 Operating Plan (the "1987–1988 Operating Plan"). The 1987–1988 Operating Plan estimated net income from LTV Steel of $239 million in 1987 and $260 million in 1988; net cash flow from LTV Steel of $270 million and $265 million, respectively, in those years; and $267.9 million annual operating income from LTV Steel in 1987. The Group also considered LTV Steel's actual operating income for the period from January through May 1987 which exceeded the Operating Plan's estimates by $44.9 million.

Having considered this information, the Group decided that restoration was necessary to prevent abuse of the pension termination insurance program. The Group ac-

cordingly voted unanimously to recommend restoration based on the establishment of abusive follow-on plans, the improvement in LTV Steel's financial condition, and LTV Steel's demonstrated willingness to fund employee retirement plans.

The SEPPAA Working Group's recommendation was forwarded to the Executive Director of the PBGC for approval. Before acting on the recommendation, the Executive Director asked for general policy guidance on restoration from the PBGC's Board of Directors, which consists of the Secretary of the Treasury, the Secretary of Commerce, and the Secretary of Labor, who is the Chairman of the Board. *See* 29 U.S.C. § 1302(d). After meeting briefly to consider the matter by telephone conference call on September 18, 1987, the Board unanimously adopted a resolution that "confirms, as a matter of policy, that the PBGC may exercise its discretion under Section 4047 of ERISA to restore plans as appropriate," and "affirms the authority of the Executive Director of the PBGC to determine when particular pension plans should be restored and to take all appropriate actions necessary to effect those determinations." PBGC Record, p. 1583.

Before the SEPPAA Working Group first met to consider restoration of the Plans, the PBGC had had several meetings and had exchanged letters with representatives of LTV and the USWA in May and July 1987 as the parties attempted unsuccessfully to resolve the PBGC's objections to the 1987 CBA Plans. In early September 1987, LTV's Chief Executive Officer called the PBGC's Principal Deputy Executive Director to ask whether it was true that the PBGC had decided to restore the Plans. Upon being informed that the agency had not reached a final decision on what action it would take in response to the 1987 CBA Plans, but that restoration was still being considered as an option, LTV requested an additional meeting with the PBGC. The PBGC's Executive Director responded by letter that the agency "would, of course, be happy to consider any additional information you might wish to supply." PBGC Record, p. 1572. As a result, representatives from LTV and the PBGC

met in Washington on September 12 and 21, 1987. In response to the PBGC General Counsel's inquiry as to the effects on interested parties of restoration, LTV's outside counsel stated that the economic effect of restoration was unclear and that restoration would give rise to time-consuming litigation, cast doubt on the reorganization, and be hard on other creditors.

*The Notice of Restoration*

On September 22, 1987, the Executive Director adopted the recommendation of the SEPPAA Working Group to restore the Plans and executed and sent the Restoration Notice to LTV and LTV Steel restoring the Plans, effective immediately, to their pretermination status as of January 13, 1987. The Restoration Notice explained that the PBGC had determined that restoration was appropriate and consistent with its duties under Title IV of ERISA because, among other things: (1) LTV Steel had abused the pension plan termination insurance program by establishing follow-on plans that essentially continued the termination Plans, with the PBGC picking up much of the cost; (2) the financial condition of LTV Steel had substantially improved since the Plans were terminated; and (3) LTV Steel had demonstrated its willingness to fund retirement programs.

The Restoration Notice informed LTV and LTV Steel that restoration "means that the Plans are ongoing since [January 13, 1987] for all purposes, including ... minimum funding obligations" and that "[b]enefit payments to retirees that were reduced because of the terminations shall be restored to their full amounts under the terms of the Plans, and the Plans shall pay to such retirees any amounts that were not paid because of the terminations, together with interest...." PBGC Record, p. 1578. The Restoration Notice also informed LTV that, as plan administrator of the restored Plans, it must comply with all of the fiduciary duties of a plan administrator under ERISA and under the terms of the Plans.

### Prior Proceedings in this Court

Asserting that restoration of the Plans violated the automatic stay under section 362 of the Code, LTV obtained, on September 23, 1987, an order to show cause from the bankruptcy court seeking, *inter alia,* a finding that the restoration violated the automatic stay and was, therefore, null and void (the "Stay Application"). On September 24, 1987, the PBGC moved for the withdrawal of the reference of the Stay Application under 28 U.S.C. § 157(d). On November 24, 1987, this court granted the PBGC's motion to withdraw the reference, finding that "the presence of significant issues of first impression, considerations of judicial economy, and the need to protect participants in the restored Plans from unduly protracted uncertainty about the status of their benefits" established sufficient cause for withdrawal. *PBGC v. The LTV Corp.,* 86 B.R. 33, 39 (S.D.N.Y.1987).

On September 28, 1987, LTV applied to the bankruptcy court for appointment as administrator *ad litem* of the Plans and for the appointment of Mellon Bank as trustee *ad litem* of the Plans. On September 28, the bankruptcy court entered consent orders appointing LTV administrator *ad litem* and Mellon Bank trustee *ad litem* of the Plans. The PBGC consented to the orders, but reserved its position that entry of such orders was neither necessary nor within the jurisdiction of the bankruptcy court. The orders provide that they are without prejudice to the PBGC's right to seek to vacate or modify the orders. The orders authorize payment of benefits from the assets of the Plans at least at the level guaranteed by the PBGC and expressly do not prejudice the positions of any interested party as to the appropriate level of benefits payable from the Plans.

As a result of LTV's refusal to comply with the restoration, evidenced, *inter alia,* by LTV's application for *ad litem* appointments and failure to pay benefits at full Plan levels, the PBGC filed a complaint in this court on October 9, 1987, to require LTV to operate the Plans as ongoing plans in compliance with the restoration (the "Enforcement Action"). This court, which had before it the PBGC's motion to withdraw the Stay Application, accepted the Enforcement Action as a related matter. On No-

vember 3, 1987, LTV supplemented the Stay Application to assert that, like the restoration, PBGC's Enforcement Action also violated the automatic stay.

On December 31, 1987, LTV filed an answer and counterclaim in the Enforcement Action. By that same date, various creditor groups affected by LTV's Chapter 11 petition had been permitted to intervene by stipulation: the Official Committee of Unsecured Creditors of LTV Corporation *et al.* (the "Committee"), the Committee's Subcommittee of Parent Creditors, and the LTV Bank Group. Later, on January 11, 1988, the Committee of Equity Security Holders intervened by stipulation. On January 15, 1988, the Motion to Intervene of BancTexas Dallas was granted. On January 21, 1988, a stipulation was filed in which LTV and the PBGC agreed to the intervention of the Fifth Third Bank, the Huntington National Bank, and Citibank. Finally, on January 26, 1988, the motion to intervene filed by two individual participants in the J & L Salaried Plan, David H. Miller and William W. Shaffer, was granted. Oral argument on Miller and Shaffer's motion for class certification was held on June 6, 1988.

Following limited discovery, the submission of briefs from the PBGC, LTV and the intervenors and other interested parties,[11] oral argument was held on March 4, 1988 on the PBGC's motion for summary judgment in its Enforcement Action and LTV's Stay Application.

### The Stay Application

#### I. *The Automatic Stay*

LTV contends that the Restoration Notice and the Enforcement Action violate the automatic stay in sections 362(a)(1), (a)(3), and (a)(6) of the Code. Section 362(a) of the Code provides that, unless the Code expressly provides otherwise, the filing of a petition for reorganization operates as a stay, applicable to all entities of:

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\* \* \* \* \* \*

(3) any act to obtain possession of property of the estate or of property from the estate, or to exercise control over property of the estate;

\* \* \* \* \* \*

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of a case under this title.

11 U.S.C. § 362(a). Section 362 is intended to provide a breathing spell for the debtor and to guarantee equal treatment for creditors. *See, e.g.,* H.R.Rep. No. 595, 95th Cong., 2d Sess. 340 (1978), *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5963, 6296–97; *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 55 (2d Cir.1976), *cert. denied,* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540, *reh'g denied,* 430 U.S. 976, 97 S.Ct. 1670, 52 L.Ed.2d 372 (1977).

The legislative history of section 362 reveals clear congressional intent that the automatic stay be broadly enforced so as to preserve the *status quo* as of the petition date, insure the orderly administration of a bankruptcy estate and prevent a race among creditors:

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be

---

**11.** The USWA filed a memorandum of law as *amicus curiae* in which the union argues that the 1987 CBA Plans are legal in all respects and cannot constitute a basis for restoration. In addition, Solidarity USA, Inc., a nonprofit corporation organized under the laws of Ohio and representing certain retirees who were hourly employees of LTV Steel, has filed a memorandum of law as *amicus curiae* in support of the PBGC's motion for summary judgment.

relieved of the financial pressures that drove him into bankruptcy.

The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors....

Subsection (a) defines the scope of the automatic stay, by listing the acts that are stayed by the commencement of the case. The commencement or continuation, including the issuance of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the bankruptcy case is stayed under paragraph (1). The scope of this paragraph is broad. All proceedings are stayed, including arbitration, license revocation, administrative, and judicial proceedings ... even if they are not before governmental tribunals.

 * * * · * * *

Paragraph (3) stays any act to obtain possession of property of the estate (that is, property of the debtor as of the date of the filing of the petition) or property from the estate (property over which the estate has control or possession). The purpose of this provision is to prevent dismemberment of the estate....

 * * * * * *

Paragraph (6) prevents creditors from attempting in any way to collect a prepetition debt.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 340–42 *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6296–98; *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 49–51, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5835–36.

LTV contends that, by restoring the Plans, the PBGC seeks to impose additional liabilities upon LTV so that a greater portion of LTV's assets will be paid to the PBGC and to satisfy its multibillion dollar claim against LTV Steel ahead of other creditors. Upholding the PBGC's actions, LTV argues, would frustrate the two major purposes of the Code: "achieving equality among creditors and giving the debtor a fresh start." *In re B.D. Int'l Discount Corp.,* 701 F.2d 1071, 1075 n. 8 (2d Cir.), *cert. denied,* 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983).

The PBGC contends that neither restoration nor the Enforcement Action "was or could have been commenced before the commencement of the case under [Chapter 11]." 11 U.S.C. § 362(a)(1). The PBGC argues that under Title IV of ERISA, the PBGC's claims against LTV Steel first arose post-petition and that, in any event, neither restoration nor the Enforcement Action is an act to recover such claims. *See* 11 U.S.C. § 362(a)(1), (a)(6). In addition, the PBGC contends that because restoration does not directly affect the assets or property of LTV Steel, neither restoration nor the Enforcement Action constitutes an act "to obtain property of ... or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Finally, the PBGC asserts that both restoration and the Enforcement Action are excepted from the stay by section 362(b)(4) of the Code because they are regulatory enforcement actions taken to further the important public policies underlying ERISA.

## II. *The Nature of the PBGC's Claims*

Section 101(4) of the Code defines "claim" to mean:

 (A) *right to payment, whether or not such right is* reduced to judgment, liquidated, unliquidated, fixed, *contingent,* matured, *unmatured,* disputed, undisputed, legal, equitable, secured, or unsecured; or

 (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(4) (emphasis added). The legislative history of 11 U.S.C. § 101(4) reveals that Congress intended to define prepetition claims broadly:

The definition is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.... By this broadest possible definition and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6266; *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5807–08. The broad definition of "claim" is central to the policy of a "fresh start" for a debtor and permits a debtor to receive "the broadest possible relief in the bankruptcy court," because liability on a "claim" can be discharged only by the confirmation of a plan of reorganization. *Id.; see* 11 U.S.C. §§ 101(11), 1141(d); *see also In re A.H. Robins Co.,* 63 B.R. 986, 989 (Bankr.E.D. Va.1986), *aff'd sub nom. Grady v. A.H. Robins Co.,* 839 F.2d 198 (4th Cir.1988).

 The PBGC has two major types of claims against LTV. As the agency responsible for administering and enforcing Title IV, the PBGC has a claim under section 4062(b) of ERISA, 29 U.S.C. § 1362(b), for statutory "termination liability" in the amount by which Plan assets were insufficient to satisfy guaranteed benefits on the date of plan termination. In addition, the PBGC has a second statutory claim under section 4062(d) of ERISA, 29 U.S.C. § 1362(d), asserted in its capacity as statutory trustee on behalf of the Plans, for due

and unpaid minimum funding contributions.[12] *See also* 29 U.S.C. § 1082; 26 U.S. C. § 412. The PBGC contends that under ERISA these claims first arose upon the post-petition termination of the Plans.

Section 4062(a) provides that any contributing sponsor of a plan, or a member of such sponsor's controlled group, shall incur termination liability "in any case in which a single-employer plan is terminated." 29 U.S.C. § 1362(a). Such liability "shall be due and payable to the [PBGC] as of the termination date." 29 U.S.C. § 1362(a), (b)(2)(A). Section 4068 of ERISA, which imposes a lien for unpaid termination liability, provides that the lien "arises on the date of termination of a plan." 29 U.S.C. § 1368(b). Under section 4048 of ERISA, the date of plan termination is the "date established by the corporation and agreed to by the plan administrator" or the "date established by the court." 29 U.S.C. § 1348(a)(3), (a)(4). Here, since the termination date was January 13, 1987, the PBGC argues that its claim for termination liability first arose six months after the commencement of LTV's bankruptcy proceedings. As for its claim as statutory trustee for due and unpaid contributions to the Plans, the PBGC contends that under section 4062(d) of ERISA it had no statutory responsibility or authority to collect due and unpaid contributions until it was appointed statutory trustee on January 12, 1987, the date on which the consent orders terminating the Plans as of January 13, 1987 were entered. 29 U.S.C. § 1362(d).

LTV does not dispute that LTV Steel's liability to the PBGC did not become due and payable under ERISA until the date of termination. LTV contends, however, that the accrued benefits, for which the PBGC has now—through restoration—reimposed LTV Steel's funding obligations, were ac-

12. On November 30, 1987, the PBGC filed these claims, which were non-contingent during the period between the termination of the Plans on January 13, 1987, and the restoration on September 22, 1987, as contingent claims in the bankruptcy case based on the contingency that restoration is held to be ineffective or that a subsequent valid termination of the Plans occurs before the confirmation of a plan or plans of reorganization. The PBGC also filed other contingent claims in the bankruptcy case, including contract claims asserted on behalf of the Plans as third-party beneficiaries for the amounts by which Plan assets may be insufficient to pay promised benefits, and claims under section 4062(c) of ERISA, 29 U.S.C. § 1362(c), for certain unfunded "benefit commitments" owed to the trust established under section 4049 of ERISA, 29 U.S.C. § 1349.

crued or earned by LTV Steel's employees prepetition and thus are attributable to the period pre-dating the Chapter 11 filing. Therefore, LTV argues, the liability to fund such benefits constitutes a prepetition claim and remains a prepetition claim regardless of when it becomes fixed. Recent bankruptcy cases that distinguish between when a claim arises for the purposes of the Code and when a cause of action accrues on a claim under state or federal law support LTV's position.

Consistent with the goals of uniform treatment for creditors and a fresh start for debtors, courts have determined when a claim arises for Code purposes by focusing upon "the time when the acts giving rise to the alleged liability were performed," since only reference to prepetition acts of the debtor will result in treating liabilities flowing from such acts in an equitable fashion. *In re Johns–Manville Corp.*, 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986); *see also In re Revere Copper and Brass, Inc.*, 29 B.R. 584, 588 (Bankr.S.D.N.Y.), *aff'd*, 32 B.R. 725 (S.D.N.Y.1983); *In re A.H. Robins Co.*, 63 B.R. at 993; *In re Edge*, 60 B.R. 690, 699–705 (Bankr.M.D.Tenn.1986). Where the debtors' obligations stem from contractual liability, even a post-petition breach will be treated as giving rise to a prepetition liability where the contract was executed prepetition. *See* 11 U.S.C. § 365(g)(1); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *see also In re Ahrens*, 64 B.R. 5, 6–7 (Bankr.E.D.Pa.1986); *In re William H. Herr, Inc.*, 61 B.R. 252, 253 (Bankr.E.D.Pa. 1986).

In *In re Johns–Manville*, 57 B.R. at 690, the bankruptcy court held that "for federal bankruptcy purposes, a prepetition 'claim' may well encompass a cause of action that, under state law, was not cognizable until after the bankruptcy petition was filed." The court declined to follow the Third Circuit's holding in *Matter of M. Frenville Co.*, 744 F.2d 332 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed. 2d 925 (1985) that "the threshold question of when a right to payment arises, absent overriding federal law, 'is to be determined by reference to state law.'" 744 F.2d at

337 (quoting *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946)). The *Johns–Manville* Court noted other bankruptcy courts' criticism of the *Frenville* decision for its "reliance upon state law to determine if a claim existed against the debtors at the time that the bankruptcy cases were commenced," *In re Yanks*, 49 B.R. 56, 58 (Bankr.S.D.Fla.1985), and for failing "to distinguish between 'claim' as defined in 11 U.S.C. § 101(4) and a cause of action for indemnity or contribution under state law." *Matter of Baldwin–United Corp.*, 48 B.R. 901, 903 (Bankr.S.D.Ohio 1985). The bankruptcy court also noted the Second Circuit's statement in *In re Baldwin–United Corp. Litig.*, 765 F.2d 343 (2d Cir.1985), that it has reservations about following *Frenville:* "We are not as certain as the District Court that, if we reached the issue, we would follow *Frenville* and hold the stay inapplicable to Paine–Webber's third-party complaint. The broad definition of 'claim' in the Bankruptcy Code ... creates a substantial question whether the stay applies to the third-party complaint." *In re Baldwin–United Corp. Litig.*, 765 F.2d at 348 n. 4.

■ Notwithstanding widespread bankruptcy court disapproval of *Frenville*, this and other district courts from this Circuit have held that the issue of when a claim arises cannot always be resolved solely with reference to the Code but sometimes requires an analysis of competing interests behind other federal laws. Thus, for example, in three recent cases our district courts have held that when the EPA's claim for cost recovery and a joint tortfeasor's claim for contribution under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 arise against a debtor in bankruptcy cannot be determined solely with reference to the broad definition of claim in section 101(4) of the Code but requires substantial consideration of the competing interests protected by federal environmental laws. *See, e.g., American Telephone & Telegraph Co. v. Chateaugay Corp.*, 88 B.R. 581 (S.D.N.Y.1988); *In re Combustion Equipment Assocs., Inc.*,

67 B.R. 709 (S.D.N.Y.1986); *In re Johns–Manville Corp.*, 63 B.R. 600 (S.D.N.Y.1986). Indeed, the need for material consideration of ERISA provided part of the grounds for the withdrawal of the instant case from the bankruptcy court. *See PBGC v. The LTV Corp.*, at 38 (material consideration of ERISA required to determine when PBGC's claims arise). Therefore, in order to determine the status of the PBGC's claims, this court must consider what acts gave rise to LTV's pension liabilities, when they occurred, and, finally, whether any competing interests in ERISA require that such liabilities be treated as post-petition claims of the PBGC.

▌ Here, the events that gave rise to the PBGC's claims and that mark them as prepetition were LTV Steel's creation and maintenance of a pension plan that was subject to ERISA's Title IV termination liability provisions and LTV Steel's employees' labor during the years preceding the Chapter 11 filing. The PBGC's right to payment upon termination was, on the petition date, a classic example of a contingent claim—"one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event." *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd*, 646 F.2d 193 (5th Cir.1981). If the extrinsic event occurs post-petition, the contingent claim simply becomes a liquidated one; it, however, is not thereby elevated to the status of a post-petition claim. Here, the extrinsic event was plan termination, which simply fixed LTV's liability to PBGC.[13]

The Code's deliberate refusal to distinguish between contingent and mature claims reflects a fundamental bankruptcy policy that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 595, 95th Cong. 2nd Sess. 309 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6266; S.Rep. No. 989, 95th Cong., 2d Sess. 22, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5808. The Code's broad delineation of prepetition claims was intended to embrace contingent claims and avoid the problems that sometimes occurred under the former Bankruptcy Act, when contingent or unliquidated claims were disqualified from sharing in the estate and, equally important from the debtor's point of view, were not discharged. *See In re Johns–Manville*, 57 B.R. at 687.

In support of its argument for post-petition status for its claims, the PBGC cites statutory provisions in ERISA that make the PBGC's claims for termination liability and for due and unpaid minimum funding contributions "due and payable" as of the termination date. *See* 29 U.S.C. § 1362(b)(2)(A), (d). Relying on these provisions, the PBGC argues that its claims against LTV are based upon a post-petition event—termination—and, therefore, arose post-petition. Termination, however, merely made the PBGC's contingent claims fixed, that is, *non-contingent*. The fact that the PBGC may not proceed against LTV Steel on its contingent claims until termination occurs does not distinguish pension liability claims from any other contingent claims that are triggered by a post-petition event. Termination alone could

---

**13.** Indeed, the PBGC's reimbursement claim in these cases as statutory guarantor is analogous to the claim of any guarantor or surety that pays post-petition under a guarantee that existed prepetition. As one commentator notes:

> To the extent that the claim of a surety for reimbursement or contribution of payments made after the filing of the case is ... allowable, such claim is treated as though it were given no higher status than is the claim of the creditor against the debtor. To give the surety better than prepetition status merely because he has made a payment to a prepetition creditor following the filing of the debtor's

> petition would distort the scheme of the statute with respect to prepetition claims and, when appropriate, post-petition administrative claims. The surety had a contingent claim against the debtor at the time of the commencement of the case. Its becoming fixed after that time in no way changes its status as a prepetition claim.

3 *Collier on Bankruptcy*, ¶ 502.05[2] (15th ed. 1987); *see also Maynard v. Elliott*, 283 U.S. 273, 275, 51 S.Ct. 390, 391, 75 L.Ed. 1028 (1931); *Matter of Fuzzy Thurston's Eau Claire Left Guard, Inc.*, 33 B.R. 579, 581 (Bankr.W.D.Wisc. 1983); 11 U.S.C. § 502(e).

not convert the PBGC's contingent prepetition claims into post-petition claims.[14]

The PBGC has failed to raise any overriding policy objectives of ERISA that would warrant a departure from the well-settled bankruptcy rule that contingent, unmatured claims be deemed prepetition claims subject to the automatic stay and dischargeable pursuant to a plan of reorganization. The PBGC has not cited to legislative history or provisions of ERISA that suggest that a debtor's minimum funding obligations and termination liability are entitled to post-petition status in the context of a bankruptcy proceeding. Indeed, the 1987 PPA amendments to ERISA, which increased the PBGC's claim for termination liability from 75 to 100% of all unfunded benefits, indicate that Congress chose to improve the PBGC's claim by increasing it, without awarding it post-petition treatment in bankruptcy. The court is not aware of any proposals during consideration of the 1987 amendments that would have afforded post-petition treatment to the PBGC's claims.

Finally, LTV Steel's liabilities, and the PBGC's claims, are analogous to ERISA claims for "withdrawal liability" owed to multiemployer plans.[15] Courts considering the status of such claims uniformly have held that withdrawal liability is based on vested benefits relating to prepetition services and that claims for withdrawal liability are prepetition claims. *See Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98 (2d Cir.1986); *In re Great Northeastern Lumber & Millwork Corp.*, 64 B.R. 426 (Bankr.E.D.Pa.1986); *Amalgamated Ins. Fund v. William B. Kessler, Inc.*, 55 B.R. 735 (S.D.N.Y.1985); *In re Silver Wheel Freightlines, Inc.*, 57 B.R. 476 (Bankr.D.Or.1985). In *McFarlin's*, the Court of Appeals for this Circuit reasoned that the liability to a pension plan to fund plan benefits that were earned through prepetition services is not a post-petition expense of administration, even though the liability matured post-petition upon plan withdrawal. Since the "consideration supporting [the] ... liability" was the employees' prepetition labor, the consideration was "attributable to the period pre-dating the filing of the Chapter 11 petition" and the liability was classified as a general unsecured claim. *Id.* at 103. The Honorable Walter R. Mansfield, rejecting an argument similar to that made by the PBGC here, stated that a "debt is not entitled to priority [*i.e.*, post-petition administrative status] simply because the right to payment arises" post-petition. *Id.* at 101. Rather, an obligation, he said, is entitled to administrative post-petition status "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *Id.* (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)).

**14.** The cases cited by the PBGC in support of its contention that its claims against LTV arose post-petition are distinguishable. In each case, to the extent that a claim was found to have arisen post-petition, the court found that the claim arose upon the post-petition conduct of the debtor, not the creditor. *See, e.g., Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992 (5th Cir.1985) (claims with respect to a fire at the debtor's property two days after Chapter 11 petition was filed held to be post-petition); *In re Continental Air Lines, Inc.*, 61 B.R. 758 (S.D. Tex.1986) (action brought by minority shareholders of corporation which was target of debtor's post-petition takeover attempt was found to be post-petition action); *In re Newman Companies of Wisconsin, Inc.*, 45 B.R. 308 (Bankr.E.D. Wis.1985) (declaratory judgment action by former employee of debtor to test validity of a noncompetition clause with respect to debtor's post-petition business activities was allowed under 28 U.S.C. § 959(a) which permits suit against debtor with respect to post-petition business activities); *Turner Broadcasting System, Inc. v. Sanyo Elec., Inc.*, 33 B.R. 996 (N.D.Ga. 1983), *aff'd mem. sub nom. Turner Broadcasting v. Rubin*, 742 F.2d 1465 (11th Cir.1984) (debtor's breach of post-petition contract resulted in post-petition claim.) Here, as discussed above, the service of LTV Steel's employees during the years preceding the Chapter 11 filing gave rise to LTV Steel's pension liabilities, and hence to the PBGC's claims.

**15.** Under sections 4201 and 4211 of ERISA, when an individual employer withdraws from a multiemployer pension plan, the withdrawing employer must pay to the plan an amount equal to the employer's *pro rata* share of the total unfunded vested benefits plan as of the date of termination. *See* 29 U.S.C. §§ 1381, 1391.

In an effort to distinguish the instant case from *McFarlin's* and other withdrawal liability cases, the PBGC suggests that those decisions turned on a finding that withdrawal liability was not a necessary cost of preserving the estate and that the denial of administrative priority does not necessarily mean that the claim arose prepetition. The rationale of the withdrawal liability cases, however, is broader than the narrow issues there decided. As the court stated in *In re Pulaski Highway Express, Inc.*, 57 B.R. 502 (Bankr.M.D.Tenn.1986), a prepetition claim for pension liability remains a prepetition claim regardless of when it becomes fixed or matured in the context of multiemployer pension plan withdrawal liability:

> Although withdrawal liability may be triggered by a post-petition event, the conclusion that it then constitutes a "post-petition claim" for bankruptcy purposes is unsupported by applicable law and is inconsistent with important bankruptcy policies. In substance, the claim is an obligation to ensure the payment of pension benefits which have previously accrued but are not payable until a future date.... The liability, i.e., the "right to payment," is incurred when the employee benefits become nonforfeitable. An employer may meet this obligation either by continuing normal operations and making the required regular contributions into the plan, or by withdrawing from the plan and paying the withdrawal liability.... The liability may be unliquidated and the amount may be contingent upon withdrawal or whether the vested benefits are unfunded, but such uncertainties do not defeat the existence of prepetition claims for benefits which accrued prior to withdrawal, which stem from pre-petition events and conduct and which were nonforfeitable and fully vested prior to filing.
>
> * * * * * *
>
> The withdrawal liability attributable to pre-petition labor is generically indistinguishable from the rights acquired by any pre-petition creditor who provides contractual services or goods to the debtor, or accrues a right to payment from the

debtor, but is not paid as of the date of the petition.

*In re Pulaski Highway*, 57 B.R. at 507–508 (citations omitted).

The PBGC has not offered a compelling reason why the post-petition termination of a pension plan should displace the actual service of employee-beneficiaries as the "acts" that give rise to a sponsor's pension liabilities. Based upon the foregoing consideration of the policies of the Code and of ERISA, the objectives of the Code will be furthered and those of ERISA not frustrated if LTV's pension liabilities to the PBGC are treated as prepetition claims.

III. *Restoration Does Not Violate the Automatic Stay*

The PBGC contends that neither restoration nor the Enforcement Action are actions to recover on its claims against LTV Steel. Neither the Restoration Notice nor the complaint in the Enforcement Action demands payment on the PBGC's claims against LTV Steel, and neither will result in any payments directly to the PBGC. The PBGC asserts that because the Restoration Notice restored the Plans to their pretermination status, the PBGC, post-restoration, is in the same position *visa-vis* LTV as it was before the Plans terminated on January 13, 1987.

LTV argues that the PBGC's contentions ignore the practical effects of its acts. The Restoration Notice instructed LTV Steel that the Plans were ongoing "for all purposes including ... minimum funding contributions." Thus, LTV argues, although restoration will not effect a direct recovery by the PBGC on its prepetition claims, restoration will (1) make LTV immediately liable for due and unpaid minimum funding contributions, (2) make LTV liable for currently accruing minimum funding contributions, and (3) result in the ongoing accrual by LTV Steel employees of pension benefits under the Plans. Further, LTV contends that, in the event that the Plans are reterminated at some future date, restoration will have served as the predicate for a substantial increase in the PBGC's termi-

nation liability claims against LTV under the 1987 PPA amendments to ERISA.

Focusing on what may prove to be the practical effects of the PBGC's restoration decision in this case, as LTV urges this court to do, could lead to an erroneous conclusion as to whether restoration, when properly effected, violates the automatic stay as a matter of law. Here, LTV has argued that the relief sought by the PBGC in its Enforcement Action—the enforcement of the Restoration Notice compelling minimum funding payments—exceeds the PBGC's authority under Title IV. LTV has also argued that if restoration is upheld, the Plans will have to be reterminated, at which time the PBGC can be expected to contend that it is entitled, under the 1987 amendments to ERISA, to increase its termination liability claim against LTV. However, the fact that the PBGC may have erred in restoring the Plans or that it may have requested relief beyond the scope of its authority does not necessarily lead to the acceptance of LTV's argument that restoration must always be subsumed by the Code and subordinated to the goals of reorganization. These considerations underlie the conclusions concerning the direct effects of restoration under sections 362(a)(1), (a)(3), and (a)(6) of the Code.

■■■■ Sections 362(a)(1) and (a)(6) of the Code's stay provisions bar all acts or proceedings to collect, assess or recover pre-

petition claims. Restoration returns to LTV Steel the immediate obligation to contribute to the Plans the minimum funding amounts required by ERISA for the plan years 1984–1986 and imposes on LTV a continuing obligation to make minimum funding contributions for the years 1987 forward. Whether LTV will be required to make these payments, however, is not determined by the simple act of restoration. In order to compel payment for past due minimum funding contributions, the Department of Labor, not the PBGC, is required to institute enforcement proceedings under Title I of ERISA. See 29 U.S.C. § 1132(a). Whether an enforcement action by the Labor Department would be barred by the automatic stay or whether the bankruptcy court would lift the stay for such an action are issues not now before this court.[16] It suffices to note that restoration per se simply reimposes on the debtor the same minimum funding obligations for the years 1984–1986 that existed prior to termination and reinstates LTV Steel's ongoing minimum funding obligations for plans that have been restored to their pretermination status. Restoring the Plans to their pretermination status does not result in any direct payments to the PBGC or in any direct payments to the Plans and, therefore, does not result in a recovery on claims for past due minimum funding contributions in violation of sections 362(a)(1) and (a)(6).[17] Similarly, because the PBGC

**16.** Restoration in a bankruptcy proceeding does not mean that minimum funding payments, otherwise payable on account of unfunded prepetition benefits, must be paid, because the provisions of Title I of ERISA, which set forth the minimum funding obligations, see 29 U.S.C. § 1082, are expressly subordinated to other non-ERISA federal laws, like the Code. Section 514(d) of ERISA, in relevant part, provides that "[n]othing in this title [Title I] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States ... or any rule or regulation issued under such law." This section has been cited for the proposition that "ERISA should not be interpreted as displacing any pre-existing federal legislation." See Bonin v. American Airlines, Inc., 621 F.2d 635 (5th Cir.1980) (Railway Labor Act), on remand, 562 F.Supp. 896 (N.D.Tex.1983), aff'd without op., 738 F.2d 435 (5th Cir.1984), cert. denied, 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 162 (1985).

On the other hand, the PBGC has offered authority for the proposition that payments for minimum funding contributions by a plan sponsor in Chapter 11 may be entitled to administrative expense priority; pursuant to sections 503(b)(1) and 507 of the Code, as actual and necessary costs or expenses of preserving the estate. See Columbia Packing Co. v. PBGC, 81 B.R. 205, 207–09 (D.Mass.1988). Because an application for administrative expense priority status for LTV Steel's minimum funding payments is not before this court, whether Columbia Packing should be followed need not be decided at this time.

**17.** It must be noted that today's decision does not resolve whether an action by the Labor Department to collect due and unpaid minimum funding contributions to the Plans would constitute an action to recover on the PBGC's contingent claims against LTV Steel.

lacks the authority to compel minimum funding payments, its decision to restore the Plans does not directly result in the PBGC's exercise of control over LTV's assets by the PBGC in violation of section 362(a)(3).

■ LTV advances a second theory under which restoration will result in the exercise of control over property of the estate. If restoration is made effective as of the January 13, 1987 termination date, LTV Steel's employees will continue to accrue service benefits from that date forward. LTV equates the compulsory accrual of liabilities under the Plans with the exercise of control over property of the debtor which is barred by section 362(a)(3). However, the scope of section 362(a)(3) does not by its terms encompass such indirect effects of restoration.

The purpose of section 362(a)(3) "is to protect the estate from *direct* action taken by creditors against a debtor's personal or real property, and to prevent an uncontrolled scramble to liquidate the estate." *In re Continental Airlines, Inc.*, 61 B.R. 758, 778 (S.D.Tex.1986) (emphasis added). Cases interpreting section 362(a)(3), therefore, "have generally involved direct action taken by creditors against a debtor's personal or real property." *Id.* at 779; *see, e.g., In re 48th Street Steakhouse, Inc.*, 61 B.R. 182, 187 (Bankr.S.D.N.Y.1986), *aff'd*, 77 B.R. 409 (S.D.N.Y.), *aff'd*, 835 F.2d 427 (2d Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988) (cancellation of debtor's lease); *In re Tel–A–Communications Consultants, Inc.*, 50 B.R. 250 (Bankr.D.Conn.1985) (repossession of debtor's vehicle); *Proyectos Electronicos, S.A. v. Alper*, 37 B.R. 931, 932 (E.D. Pa.1983) (recovery of purchased goods from debtor's estate). Courts, moreover, "have clearly distinguished between the entry of judgment, and attempts to enforce a judgment against property of the estate in determining whether a violation of subsection 362(a)(3) has occurred." *In re Continental Airlines*, 61 B.R. at 779; *see, e.g., Kommanditselskab Supertrans v. OCC Shipping, Inc.*, 79 B.R. 534 (S.D.N.Y.1987)

(Section 362(a)(3) stays enforcement of judgment against debtor's property).

■ Restoration does not constitute direct action against LTV's property or assets. Restoration simply reimposes on LTV Steel the obligation to provide pension benefits for employees. This obligation is an ordinary cost of doing business and one that LTV Steel has readily accepted under the 1987 CBA Plans, albeit outside the regulatory framework of ERISA. However, contrary to LTV Steel's assumption, termination did not remove the company and its Plans from ERISA's regulatory framework. The PBGC's authority to restore terminated pension plans to their pretermination status necessarily implies that termination does not erase a plan sponsor's obligations under ERISA but rather suspends certain obligations and transforms others into liability claims. For example, although termination relieves the plan sponsor of its obligation to make minimum funding contributions directly to the Plans, section 4062 of ERISA recasts the sponsor's minimum funding obligations as liabilities directly to the PBGC.

As the bankruptcy court stated in *In re Beker Indus. Corp.*, 57 B.R. 611, 624 (Bankr. S.D.N.Y.1986), "the Code does not change the business and regulatory environment in which a debtor operates." Although LTV Steel seeks to minimize the application of ERISA to its post-petition pension activities, ERISA's restoration provision compels the conclusion that an employer who funds a qualified ongoing pension plan may under appropriate circumstances be required to resume its statutory obligations for a plan that has been terminated. Therefore, the continued accrual of employee pension benefits results from maintaining a qualified pension plan under ERISA. The liability that LTV Steel incurs as such benefits accrue does not transfer or exercise control over LTV Steel's property.

■ LTV's final attempt to place restoration within the category of actions barred by the automatic stay is premised upon the assumption that retermination of the Plans is inevitable. Because Plan liabilities ex-

ceed Plan assets, if, upon restoration, LTV is not able to make current minimum funding contributions to the Plans, the Plans will ultimately be financially exhausted, and the PBGC will be compelled to terminate them. If the Plans are not restored, the amount of the PBGC's termination liability claim in this case would equal 75% of the unfunded guaranteed benefits. But if the Plans were restored and then reterminated, the PBGC can be expected to claim reimbursement for 100% of all unfunded benefits under the 1987 PPA amendments. Thus, LTV argues, even if the PBGC is now seeking to restore the Plans for the sole purposes of allowing full retirement benefits (not just guaranteed benefits) to be paid out of Plan assets and allowing active workers to continue to accrue benefits (as was the case immediately prior to termination), without compelling minimum funding payments, restoration violates the automatic stay because its only lasting effect would be to enable the PBGC to argue upon the inevitable retermination of the Plans that it is entitled to assess an increase in its claim for termination liability under ERISA. LTV has estimated, and the PBGC does not dispute, that the 1987 PPA amendments to ERISA could increase the PBGC's claim for termination liability by approximately $800 million upon retermination.

Based upon these assumptions concerning retermination, LTV suggests that restoration should be viewed as an act by the PBGC to "assess" an increase in its claims or to "recover" more on its prepetition claims than it would otherwise be entitled to recover in violation of sections 362(a)(1) and (a)(6). However, the automatic stay does not apply to speculation about recovery on an attenuated future liability. First, it remains to be seen whether resto-ration can be upheld on any of the grounds articulated by the PBGC in the Restoration Notice. Second, if restoration is upheld and retermination proves to be inevitable, substantial questions will be raised as to (a) whether the period between the termination date and the retermination date should be accounted for in assessing LTV's liabilities to the PBGC and (b) whether the PBGC will be permitted to invoke the benefits of the 1987 PPA amendments to enhance its claims against LTV. Retermination is replete with unanswered questions concerning the respective rights of LTV and the PBGC. Therefore, the prospect of future retermination of the Plans cannot mark restoration as an act to increase a prepetition claim in violation of section 362(a)(6).[18]

In sum, section 362(a) prohibits only action taken "directly against the property of the debtor's bankrupt estate." *In re Nashville White Trucks, Inc.*, 731 F.2d 376, 378 (6th Cir.1984). The PBGC's authority under section 4047 of ERISA is limited to restoring the Plans to their pretermination status and thereby converting the PBGC's claims for minimum funding contributions and for termination liability back to contingent claims against LTV Steel and reinstating LTV Steel's ongoing statutory obligations as a sponsor of qualified plans under ERISA. Restoration alone cannot result in immediate involuntary payments from LTV's assets to meet minimum funding requirements, nor can restoration cause a direct change in the possession or control of any of LTV's assets. Finally, whether restoration will serve as a condition precedent to an ultimate increase in the PBGC's claims against LTV is a question not yet ripe for resolution. Therefore, neither restoration nor the Enforcement Action vio-

---

18. Thus, this case can be distinguished from *In re Texaco Inc.*, 73 B.R. 960 (Bankr.S.D.N.Y. 1987), where certain noteholders sought to lift the stay in order to serve a notice of acceleration upon the debtor, Texaco Capital, Inc., and thus lock into a higher rate of interest under the terms of their notes. There, because the notice would satisfy a "condition precedent" for asserting a larger claim, the court held that it would disrupt the *status quo* and, thus, violate the stay by permitting discrete creditors to advance their interest during the case. *Id.* The court, therefore, refused to lift the stay. In *Texaco* even though the movants had not sought immediately to collect amounts due on certain notes, there was no dispute that service of a notice of acceleration would directly increase their claims. Here, by contrast, whether restoration would lead to retermination and what the consequences of retermination would be are issues that mercifully are not appropriate for present adjudication.

late the automatic stay provisions of the Code.

## IV. Section 362(b)(4) of the Code Exempts Restoration

██ Even if restoration could be deemed to constitute a violation of the automatic stay, the PBGC's decision to restore the Plans falls within the exemption from the automatic stay found in section 362(b)(4) of the Code for police or regulatory actions taken to protect the public health and welfare. The stay provisions of section 362(a) do not "change the business and regulatory environment in which a debtor operates," *In re Beker Indus. Corp.*, 57 B.R. at 624, or give a debtor "*carte blanche* to ignore non-bankruptcy law," *Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 502, 106 S.Ct. 755, 760, 88 L.Ed.2d 859 (1986). Congress made this clear by "expressly provid[ing] that the automatic stay provisions of the Bankruptcy Code do not apply when the government is seeking to enforce its police or regulatory power." *United States v. Wheeling–Pittsburgh Steel Corp.*, 818 F.2d 1077, 1086 (3d Cir. 1987). Thus, section 362(b)(4) of the Code provides that the filing of a bankruptcy petition does not operate as a stay:

> under subsection (a)(1) of [section 362] of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

11 U.S.C. § 362(b)(4).

Leaving aside for the moment questions as to the appropriateness of the procedures followed by the PBGC in restoring the Plans [19] and as to the merits of the restoration decision, there is no dispute that ERISA expressly provides for restoration as an act by the PBGC to carry out its regulatory authority under Title IV. A primary purpose of ERISA as a whole is "the protection of individual pension rights." H.R.Rep. No. 533, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639. The detailed findings on which ERISA is predicated show that the statute was enacted to "provide for the general welfare" by protecting the "continued well-being and security of millions of employees" who participate in pension plans. 29 U.S.C. § 1001(a). Congress found that "owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits...." *Id.; see Nachman Corp. v. PBGC*, 446 U.S. 359, 362, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980). Therefore, one of the principal purposes of Title IV was "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 720, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984). "[T]o prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated," *Nachman Corp. v. PBGC*, 446 U.S. at 374, 100 S.Ct. at 1732–33, Congress established the pension plan termination insurance program in Title IV of ERISA. SEPPAA strengthened that program for single-employer pension plans like the plans in this case.

Title IV establishes the PBGC as a corporation administered by a board of directors and endows it with certain regulatory, investigatory and regulatory powers with respect to the provisions of Title IV. 29 U.S.C. §§ 1302(b)(3), 1303(a)(e). The PBGC's regulatory powers under Title IV

---

**19.** LTV objects to the sending of the Restoration Notice announcing that the Plans had been restored as an administrative *fait accompli* and to the relief requested in the Enforcement Action —minimum funding contributions—as being outside the PBGC's regulatory authority under Title IV. As discussed above, to penalize the PBGC for overreaching its express statutory authority and thereby to preclude judicial consideration of restoration as a regulatory act would serve neither the interests of the parties nor resolve the consequences of restoration, when properly effected. Without guidance from prior administrative practice or court decisions construing the restoration provision, the PBGC moved through uncharted waters as it carried out what it believed to be its statutory mandate. Whatever errors it may have made in that process are within the powers of the court to correct.

include the express authority to "restore" terminated plans to their pretermination status. Section 4047 of ERISA provides in relevant part:

> In the case of a plan which has been terminated under section 4041 or 4042, the [PBGC] is authorized in any such case in which the [PBGC] determines such action to be appropriate and consistent with its duties under this title to restore the plan to its pretermination status, including, but not limited to, the transfer to the employer or a plan administrator of control of part or all of the remaining assets and liabilities of the plan.

29 U.S.C. § 1347.

The PBGC contends that restoration serves each of the purposes of Title IV. As set forth in section 4002(a) of ERISA, those purposes are: (1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants; (2) to provide for the timely and uninterrupted payment of benefits under plans to which Title IV applies; and (3) to maintain premiums at the lowest level consistent with the PBGC's obligations under the statute. 29 U.S.C. § 1302(a)(1)–(3). Congress further declared in SEPPAA that the policy of Title IV is, among other things, (1) to increase the likelihood that participants under single-employer defined benefit pension plans will receive their full benefits and (2) to provide for transfer of unfunded pension liabilities to the termination insurance system only in cases of severe hardship. *See* 29 U.S.C. § 1001b(c)(3), (4). Whether or not restoration can ultimately be sustained on the grounds that it furthers the purposes of Title IV, there is a sufficient relationship between the potential effects of restoration and the policies of Title IV to qualify restoration as a regulatory act. For example, when properly effected, restoration can ensure that participants and beneficiaries will receive their full benefits and continue to accrue benefits at pretermination levels in accordance with the terms of the restored plans. Similarly, restoring plans to a financially sound employer limits the transfer of unfunded pension liabilities to the pension insurance program to cases of severe hardship. For the same reason, by relieving the financial strain on the PBGC, restoration serves to maintain premiums at a reasonable level.

LTV argues, however, that even if the Enforcement Action could be deemed within the scope of the PBGC's regulatory and enforcement powers under Title IV of ERISA, the exclusion for regulatory acts does not apply because the primary purpose of the PBGC's act of restoring the Plans was the protection of a pecuniary interest. The pecuniary purpose test for acts by governmental agencies stems from the legislative history of the Code which provides, in part, that section 362(b)(4):

> is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate.

124 Cong.Rec. H 11089 (Sept. 28, 1978), *reprinted in* 1978 U.S. Code Cong. & Ad. News 6436, 6444–45 (statement of Rep. Edwards).

> Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 343, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5963, 6299; S. Rep. No. 989, 95th Cong., 2d Sess. 52, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5838.

In support of their respective positions, LTV has cited numerous cases holding that governmental actions intended primarily to protect a pecuniary interest are not ex-

empted by section 362(b)(4)[20] and the PBGC has cited almost as many holding that governmental actions taken in the public interest fall within the exemption, notwithstanding some incidental financial benefit.[21] As the bankruptcy court observed in *In re Beker Indus. Corp.*, the cases construing section 362(b)(4) and the pecuniary purpose test "do not admit of easy classification." *In re Beker Indus.*, 57 B.R. at 629 (comparing cases); *see also In re Lawson Burich Assocs., Inc.*, 31 B.R. 604, 611 (S.D.N.Y.1983) (discussing cases). In any event, in seeking the line between governmental actions to protect a pecuniary interest and those to protect the public health and safety, courts have drawn distinctions that are inappropriate for the instant case. In enacting Title IV, Congress recognized that the financial security and the well-being of the employees whose pensions Title IV insures are virtually inseparable interests. *See* 29 U.S.C. § 1001(a). Thus, as the court astutely observed in *In re Century Brass Products, Inc.*, No. 85 Civ. 585, slip op. (D.Conn. Nov. 24, 1986), "[i]t is hard to imagine any action taken by the PBGC that did not involve its pecuniary interest." *In re Century Brass*, slip op. at

11. Unlike employment discrimination or environmental laws, which arguably have a more direct impact on the non-monetary aspects of the public health and welfare, Title IV of ERISA provides for the health and welfare of employees by securing their pecuniary interests. In carrying out its statutory obligations under Title IV, the PBGC is, therefore, authorized to take certain actions to protect itself from unreasonable or unnecessary pecuniary loss. Thus, section 4042 of Title IV permits the PBGC to terminate pension plans where minimum funding standards are not met, where benefits are not paid when due, where a "reportable event," such as bankruptcy, has occurred, or where "the possible long run loss of the [PBGC] with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated." 29 U.S.C. § 1342(a). Congress intended to protect the PBGC from having to stand by and watch while "a bankrupt employer bleeds itself to death," and, therefore, expressly exempted termination proceedings from the automatic stay. *In re Century Brass*, slip op. at 11; *see* 29 U.S.C. § 1342(e).

20. *See, e.g., In re State of Missouri*, 647 F.2d 768, 775–76 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982) (state regulation of grain storage transactions and grain warehouses related to the state's pecuniary interest in, and conflicted with, bankruptcy court's control over estate property and was not within the 362(b)(4) exception); *In re Organized Maintenance, Inc.*, 47 B.R. 791, 795 (Bankr.E.D.N.Y.1985), *vacated on other grounds*, 69 B.R. 298 (E.D.N.Y.1987) (Department of Labor administrative proceeding for employee wages and fringe benefits not excepted by 362(b)(4) because the government was trying "to protect the pecuniary interest [of the contractor's employees] in property of the estate"); *In re Greenwald*, 34 B.R. 954, 957 (Bankr.S.D.N.Y.1983) (Department of Health stayed from pursuing administrative proceedings; "Manifestly, the Commissioner [sought] to protect a pecuniary interest in property of the debtor to the extent of a claim for medicaid overpayments"); *In re Geffken*, 43 B.R. 697, 701 (Bankr.N.D.Ohio 1984) (state's attempt to enjoin further business operations of debtor for failure to pay premiums to worker's compensation fund held subject to Section 362(b)(4) since statute enacted for primary purpose of enforcing state's pecuniary interest); *In re Rath Packing Co.*, 35 B.R. 615, 622 (Bankr.N.D.Iowa 1983)

(state's attempt to revoke debtor's self insurance exemption pursuant to worker's compensation law subject to Section 362(b)(4) since statute "although regulatory in nature, primarily relate[s] to the protection of the pecuniary interest in the debtor's property").

21. *See, e.g., EEOC v. Rath Packing Co.*, 787 F.2d 318, 324–25 (8th Cir.), *cert. denied*, 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986) (stay inapplicable to EEOC action to enforce Title VII because action, although brought for the benefit of specific individuals, is more broadly aimed at preventing harm to the public); *Donovan v. Porter*, 584 F.Supp. 202, 207 (D.Md.1984) (ERISA action by Secretary of Labor against plan fiduciaries to enforce provisions of Title I and assess a penalty for violations of those provisions "clearly the type of regulatory action Congress had in mind when it developed the exceptions to the automatic stay provision"); *In re Lawson Burich Assocs.*, 31 B.R. 604, 612 (S.D.N.Y.1983) (financial interests do not preclude application of section 362(b)(4) where regulation clearly is in the public interest); *Donovan v. TMC Indus., Ltd.*, 20 B.R. 997, 1006 (N.D.Ga. 1982) (to allow bankruptcy petition to preempt relief available under Fair Labor Standards Act to protect health and welfare of workers "is unimaginable").

Although Congress did not expressly exempt restoration proceedings from the automatic stay, the regulatory policies and interests that the PBGC seeks to further by restoring a plan are similar to those it protects when it terminates a plan. The PBGC's own pecuniary interests are simply surrogates for the pecuniary interests of millions of American workers whose pensions it insures. Therefore, where, as here, the PBGC exercises it statutory authority in a manner that it believes furthers such ERISA policies as maintaining premium costs at reasonable levels so as to encourage the continuation and maintenance of voluntary private pension plans and permitting termination only in cases of severe hardship, the PBGC acts on behalf of the well-being of millions of American workers whose future ability to provide food, clothing, and shelter for themselves and their families depends on the security of their pensions.[22]

The PBGC proceeded with restoration and the Enforcement Action on the belief that its acts were exempt from the operation of the automatic stay. Where a governmental unit determines that its police power or regulatory proceeding is exempt from the automatic stay under section 362(b)(4), it is not required to petition the bankruptcy court for relief from the stay prior to commencing or continuing its proceeding. *NLRB v. Edward Cooper Painting, Inc.*, 804 F.2d 934, 939 (6th Cir.1986).

Totally aside from the merits of the restoration, restoration is exempt from the stay under section 362(b)(4) as an act to enforce the PBGC's regulatory authority in furtherance of the public health and welfare.

### The Enforcement Action

■ The central issue in the PBGC's Enforcement Action is the validity of the agency's determination to restore the Plans. The PBGC's complaint states simply that, pursuant to authority granted in section 4047 of ERISA, 29 U.S.C. § 1347, the PBGC restored the Plans and that LTV Steel has refused to comply with the restoration. The complaint seeks an order directing LTV Steel to comply with the Restoration Notice by operating the Plans as ongoing pension plans. This court has jurisdiction under section 4003(e) of ERISA, 29 U.S.C. § 1303(e).[23] Although the PBGC has initiated judicial review by these proceedings, the restoration decision constitutes final agency action; therefore, judicial review of that agency decision is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq. Cf. Sierra Club v. United States Army Corps of Eng'rs*, 772 F.2d 1043 (2d Cir.1985) (where judicial review not expressly provided under agency's enabling statute, review is under APA).

### V. *The Scope of Review*

■ On the PBGC's motion for summary judgment, the appropriate standard

---

22. Here, the USWA, the PBGC's most immediate constituency, has filed a brief as amicus curiae in which it argues that the 1987 CBA Plans do not abuse Title IV and cannot serve as a basis for the PBGC's restoration decision. Thus, on at least one issue the USWA has taken a position contrary to the PBGC, although the USWA has not taken a position with respect to the larger issue of the PBGC's restoration authority. On the other hand, Solidarity USA, Inc., representing certain LTV retirees who do not believe their interests are adequately represented by the USWA, has filed a brief in support of the PBGC's decision to restore the Plans. Solidarity USA argues that LTV Steel should be required to pay retirees their full benefits unless LTV can demonstrate that it would be a severe hardship to do so. That the USWA, after collective bargaining for what it considered to be the most complete benefit arrangement it could achieve for its members under the circumstances, has

adopted a position that puts it in direct conflict with the PBGC does not call into question the legitimacy of the PBGC's claim to act on behalf of America's workers. In any case in which it exercises its regulatory authority under Title IV, the PBGC is required to act in a manner consistent with its statutory duties which encompass the wellbeing of all employees whose pensions are insured under Title IV.

23. Under section 4003(e)(1), 29 U.S.C. § 1303(e)(1), the PBGC is authorized to bring "[c]ivil actions ... for appropriate relief, legal or equitable or both, to enforce the provisions of [Title IV]." Similarly, section 4003(f)(1) of ERISA, 29 U.S.C. § 1343(f)(1), provides that "any person who is ... adversely affected by any action of the [PBGC] with respect to a plan in which such person has an interest ... may bring an action against the [PBGC] for appropriate equitable relief in the [district court]."

for relief is whether the PBGC's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See* 5 U.S.C. § 706(2)(A).[24] Judicial review on the instant motion will be limited to an examination of the PBGC Record which documents the agency's decision to restore the Plans. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978).

Summary judgment is to be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where, as here, the case involves review of agency action, the material facts are those set forth in the administrative record. *Milton v. Harris,* 616 F.2d 968, 975 (7th Cir.1980); *see Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). In such a case, "[t]he task of the reviewing court is to apply the appropriate APA standard for review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Florida Power & Light v. Lorion,* 470 U.S. at 743–44, 105 S.Ct. at 1607. The validity of the agency's action must "stand or fall" on that record. *Camp v. Pitts,* 411 U.S. at 143, 93 S.Ct. at 1244; *see also Vermont Yankee,* 435 U.S. at 549, 98 S.Ct. at 1214. That determination is purely a question of law.

■ Judicial review of agency action under the "arbitrary and capricious" standard mandates a searching inquiry into the facts and their relationship to the articulated basis for an agency's action. After satisfying itself that the agency has acted within the scope of its authority, the court must engage in a "thorough, probing, in-depth" review to determine whether the agency's decision-making process was reasoned, took into account all relevant policies and information, and reached a result consistent with congressional intent. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416–17, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Sierra Club v. United States Army Corps of Eng'rs,* 772 F.2d at 1051. A reviewing court must determine whether the agency's stated explanation for its action is "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n v. State Farm Auto Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (quoting *Bowman Transportation, Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). As the Supreme Court held in *State Farm:*

> [n]ormally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*State Farm,* 463 U.S. at 43, 93 S.Ct. at 2867. While a court may not substitute its own judgment for that of the agency, it similarly may "not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.*

Among the matters subject to review is whether an agency has given appropriate

---

**24.** Since Title IV does not expressly require the PBGC to hold a hearing or make formal findings pursuant to a hearing record pursuant to 5 U.S.C. §§ 554, 556, and 557, the proper standard for judicial review of the PBGC's decision is not the "substantial evidence" test which is appropriate when reviewing findings made on a hearing record. *See* 5 U.S.C. § 706(2)(E). LTV argues that because the restoration decision was "adjudicatory in nature and the [PBGC's] fact-finding procedures [were] inadequate," *see Citi-*

*zens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), *de novo* review is required to determine whether the PBGC's decision was "unwarranted by the facts." *See* 5 U.S.C. § 706(2)(F). However, on the instant motion for summary judgment, a preliminary review of the PBGC's acts and procedures is required to determine whether the standards for *de novo* review have been satisfied.

consideration to competing policies if its actions may implicate a national policy beyond its area of expertise. An agency must be cognizant of any possible conflict and must adopt narrowly drawn remedies in a manner that will accommodate that national policy. *See, e.g., Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 172–74, 83 S.Ct. 239, 248–49, 9 L.Ed.2d 207 (1962) (where agency's lack of expertise and encroachment into areas beyond its jurisdiction contravene national policy, choice of "sweeping relief" inappropriate where "more precise and narrowly drawn" remedy available); *LaRose v. FCC*, 494 F.2d 1145, 1146 n. 2, 1147–50 (D.C.Cir. 1974) (where agency action encroaches upon or compels consideration of federal policies beyond the expertise of the agency, the agency must be alert to and must minimize any conflict).

Finally, the court must examine the agency's procedural approach to determine whether it was responsible and consistent with its statutory purpose. Under the arbitrary and capricious standard, "[e]ven if the court concludes that an agency's findings are supported by substantial evidence, it may nonetheless find the procedures used to reach a final determination 'reflect arbitrary and capricious action.'" *O'Connor v. Heckler*, 613 F.Supp. 1043, 1046 (S.D.N.Y.1985), (quoting *Bowman Transp. v. Arkansas–Best Freight Sys.*, 419 U.S. at 284, 95 S.Ct. at 441); *accord United States Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519, 526 (D.C.Cir.1978) (under arbitrary and capricious standard, "the court must examine the procedures employed by the agency in reaching its decision to ensure that these procedures comply with applicable statutory and constitutional requirements"); *see also Overton Park*, 401 U.S. at 417, 91 S.Ct. at 824 (under arbitrary and capricious standard, "[t]he final inquiry is whether the Secretary's action followed the necessary procedural requirements").

The PBGC's Restoration Notice informed LTV Steel that restoration was appropriate and consistent with its duties under Title IV of ERISA. The PBGC's decision was based upon three principal findings: (1) LTV Steel had abused the pension plan termination insurance program by establishing follow-on plans that essentially continued the terminated Plans, with the PBGC picking up much of the cost; (2) the financial condition of LTV Steel had substantially improved since the Plans were terminated; and (3) LTV Steel had demonstrated its willingness to fund retirement programs. The scope of the PBGC's restoration authority and the legal and factual sufficiency of the grounds asserted for restoration will be determined below.

## VI. *The PBGC's Restoration Authority*

■ To determine whether the PBGC has the authority to restore terminated plans to their pretermination status, reference must first be made to the language of the statute. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed. 2d 931 (1979). Section 4047 of ERISA provides, in part:

> In the case of a plan which has been terminated under section 4041 or 4042, the [PBGC] is authorized in any such case in which the [PBGC] determines such action to be appropriate and consistent with its duties under [Title IV], to take such action as may be necessary to restore the plan to its pretermination status, including, but not limited to, the transfer to the employer or a plan administrator of control of part or all of the remaining assets and liabilities of the plan.

29 U.S.C. § 1347. This provision contains little in the way of restrictive language. Section 4047 does not on its face limit the PBGC's ability to restore plans during an ongoing bankruptcy case, nor does it require that the PBGC apply to the district court for a' decree adjudicating that the plan be restored. *Cf.* 29 U.S.C. § 1341(c)(2)(B)(ii) (bankruptcy court approval required for distress termination), § 1342(c) (court order required for involuntary termination by PBGC). Indeed, section 4047 provides that the "transfer to the employer or a plan administrator of control of ... the remaining assets and liabilities of the plan" is an appropriate means for

restoring a plan. If Congress had intended that such direct action be preceded by application to a district court, it surely could have so provided in the statute.[25]

LTV and several of the intervenors urge this court to construe section 4047 as limiting the PBGC's restoration powers to the ability to initiate a civil action for restoration under Title IV's civil enforcement provision. *See* 29 U.S.C. § 1303(e). Imposing such a requirement on the PBGC, LTV argues, reconciles the court order requirements of Title IV's termination provisions with the PBGC's ability to restore plans under section 4047. Under section 4041 of ERISA, the distress termination of a single-employer pension plan of a company undergoing Chapter 11 reorganization can only be achieved with the express approval of the bankruptcy court. *See* 29 U.S.C. § 1341(c)(2)(B)(ii). Similarly, if the PBGC seeks to effect an involuntary plan termination, section 4042(c) of ERISA expressly requires application "to the appropriate United States district court for a decree adjudicating that the plan must be termi-nated." 29 U.S.C. § 1342(c). In light of the detailed statutory provisions governing the right to terminate by court order, LTV argues that section 4047's prescription that the PBGC can thereafter take "such action as may be necessary" to restore should be viewed as a method for allowing restoration upon court application by the PBGC, with the plan sponsor having an opportunity to be heard in a formal adjudicatory setting. Restoration may then be proper, LTV contends, if the court that approved termination finds restoration appropriate because the factors underlying the termination have changed materially—not because the PBGC's reasons for wanting restoration are not arbitrary and capricious.

Despite the symmetrical appeal of LTV's contention that Congress could not have intended to grant the PBGC unilateral veto power over court approved terminations, established principles of statutory construction compel the conclusion that Congress did intend to grant the PBGC the power to restore terminated plans without

---

**25.** The legislative history of section 4047 offers little guidance as to the intended scope of the PBGC's restoration authority. The House Conference Report provides:

> Restoration of plans.
>
> Neither the House bill nor the Senate amendment had any specific provision that procedures against a plan in the termination phase might be abandoned by the [PBGC] if the employer and plan enjoyed a favorable reversal of business trends, or if some other factor made termination no longer advisable.
>
> Under the conference substitute, the [PBGC] may *cease any termination activities and do what it can to restore the plan* to its former status. As a result, a terminated plan being operated by a trustee as a wasting trust may be restored if, during the period of its operation by the trustee, experience gains [sic] or increased funding make it sufficiently solvent. The [PBGC] may, when appropriate, transfer to the employer or plan administrator part or all of the remaining assets and liabilities.

H.R. Conf.Rep. No. 1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 5038, 5157–58.

While these statements accord with the statute's unrestricted grant of restoration authority to the PBGC, language in the legislative history of SEPPAA suggests that Congress recognized that the decision on restoration should rest with the appropriate adjudicative entity, government agency or court in *cases of challenges by third parties to the propriety of a proposed voluntary* plan termination, and that the PBGC is not the appropriate decision-maker:

> The Committee recognizes that the PBGC is not (and should not be) in a position to determine whether a proposed termination violates the contractual or statutory rights of any affected parties. Rather this determination must ultimately rest with the appropriate adjudicative entity, government agency, or court, as the case may be. Furthermore, the decision on what the appropriate remedy should be if the termination is found to have been improper (and specifically, *whether or not the plan should be restored*) also rests with the appropriate adjudicative entity, government agency or court.

H.R.Rep. No. 99–300, 99th Cong., 2d Sess. 293, *reprinted in* 1986 U.S.Code Cong. & Admin. News 42, 944 (emphasis added).

At the same time, the remarks of Senator Nickles, the Senate Floor Manager of SEPPAA, reveal his expectation that section 4047 places the authority to restore firmly with the PBGC: "I expect that the [PBGC] will block ... other abuses of the ... termination rules under Title IV," such as employers' "actions to impel involuntary termination of a plan by the PBGC and thereby limit the liability to plan participants and the PBGC," or actions for the principal purpose of meeting the criteria in section 4041(c)(2)(B) of ERISA for a distress termination. 132 *Cong.Rec.* S2726 (daily ed. Mar. 14, 1986) (statement of Sen. Nickles).

first obtaining court approval. First, a court may not impose additional procedural requirements upon an administrative agency. *Vermont Yankee*, 435 U.S. at 523–25, 98 S.Ct. at 1201–02. Second, the ordinary meaning of the language of section 4047 suggests that the PBGC needs no judicial authorization to restore a plan. "Since it should be generally assumed that Congress expresses its purposes through the ordinary meaning of the words it uses, ... '[a]bsent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive.'" *Escondido Mutual Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed. 2d 753 (1984) (quoting *North Dakota v. United States*, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983)). Third, the example that Congress used to indicate what might be a proper method of restoring a plan—transferring the plan's assets and liabilities to the plan sponsor—indicates that Congress intended direct PBGC action rather than indirect action through a court proceeding.

Moreover, related provisions of ERISA support the conclusion that Congress intended the PBGC to restore plans through administrative determinations. In addition to the court order requirements in the termination provisions already discussed, Congress also required court approval for action by the PBGC to collect unpaid insurance premiums, 29 U.S.C. § 1307(c); to enforce the PBGC's lien with respect to employer liability, 29 U.S.C. § 1368(d); and to enforce subpoenas, 29 U.S.C. § 1303(c). Congress' failure to include such a provision in section 4047 is "strong evidence" that it did not intend to impose a requirement of prior court approval with respect to restoration. *See Richerson v. Jones*, 551 F.2d 918, 928 (3d Cir.1977). "[W]here a statute with respect to one subject contains a given provision, the omission of such provision from a similar statute is significant to show a different intention existed." *Id.* (quoting *General Electric Co. v. Southern Constr. Co.*, 383 F.2d 135, 138 n. 4 (5th Cir.1967).

Enforcing the literal meaning of section 4047 is not inconsistent with Title IV's overriding purpose or its statutory scheme. Congress enacted Title IV to encourage the continuation of voluntary private pension plans and to ensure uninterrupted payment of benefits to participants and beneficiaries. 29 U.S.C. § 1302(a). The requirement of court approval for a distress termination under section 4041(c) or an involuntary termination under section 4042 is understandable, because in such terminations, participants may immediately experience cutbacks in their benefit payments. In a restoration, however, the plan is restored to its pretermination status, which means that all benefits under the plan must be paid out of plan assets. The immediate effect on participants, whose interests ERISA primarily protects, is either no change or an increase in benefit payments. It was, therefore, not irrational for Congress not to require prior court approval for restorations. Moreover, a party aggrieved by an allegedly improper restoration is not without a remedy; the party can seek judicial review of the agency's decision by bringing an action against the PBGC under 29 U.S.C. § 1303(f).

The PBGC acted within the scope of its authority under Title IV when it determined to restore the Plans without first obtaining court approval. The next issue is whether the PBGC's decision was arbitrary and capricious and whether its procedural approach was responsible and consistent with the agency's statutory purpose.

### VII. *The Restoration Decision was Arbitrary and Capricious*

The restoration decision was based upon the PBGC's finding that (1) the 1987 CBA Plans constituted an abuse of the termination insurance program, (2) LTV Steel's financial condition had improved to the point where the company could afford to fund the Plans and (3) LTV Steel had demonstrated its willingness to fund retirement programs. The first and third factors concern LTV Steel's establishment of the 1987 CBA plans, and their legal and factual sufficiency as justification for the restoration decision will be considered together.

## A. *The 1987 CBA Plans*

The primary factor underlying the PBGC's restoration decision was LTV Steel's adoption of the 1987 CBA Plans, which, the PBGC contends, provide benefits substantially equivalent to those provided under the terminated Plans. The PBGC determined that the 1987 CBA Plans were *de facto* continuations of the Plans and permitted LTV Steel to provide an ongoing retirement program for its employees with a major part of the cost being paid through the PBGC's guarantee of benefits under the terminated Plans. Thus, the PBGC concluded that the 1987 CBA Plans constituted an abuse of the pension insurance program under Title IV.

The PBGC's abuse theory is based largely on three opinion letters issued by the agency since 1981 in which it identified certain factors that might give rise to restoration. In an opinion letter dated April 24, 1981, the PBGC stated that it would not recognize an employer's proposed voluntary termination of a plan under 29 U.S.C. § 1341 in a case where a proposed subsequent benefit program "contemplates the use of the PBGC's guaranteed benefit payments as a constituent element of a redesigned, ongoing retirement program." PBGC Record, p. 204. There, the employer sought to establish two new plans following a proposed termination which, together with the payment of PBGC guarantees, would provide benefits to retirees and employees, both present and future, as though no termination had occurred. The PBGC rejected this proposal, stating:

> In our view, the termination insurance program of Title IV was not intended to subsidize an employer's ongoing retirement program. Accordingly, we believe that a purported termination of one plan, contrived in concert with the establishment of new retirement arrangements which are designed to provide substantially the same benefits for the future,

should not be treated as a termination within the statutory contemplation so as to require the payment of PBGC guarantees.

*Id.*, p. 206. Fearing that other employers might "find it advantageous to establish similar arrangements to secure PBGC's payment of the major portion of [their] costs of an ongoing retirement program," the PBGC observed that "the consequences of our acceptance of the type of proposal you are advancing could be either a huge shift of pension costs to PBGC's premium payers, or the total collapse of the insurance system." *Id.*

In an opinion letter dated May 11, 1981, the PBGC reiterated its position that it would not treat as terminated a pension plan whose sponsor subsequently established a new retirement program "crafted so that retirees and employees, both present and future, will receive benefits as though no termination had occurred" but with the "PBGC ... funding a major portion of the program's cost." *Id.*, p. 200. In both 1981 letters, the PBGC stated that it would rely on its restoration authority under section 4047 to prevent the use of PBGC funds "to provide bail-outs for financially pressed firms"—a result which the PBGC deemed to be "patently at odds with the legislative purpose." PBGC Record, p. 206. The PBGC's views on this subject were most recently set forth in an opinion letter dated December 17, 1986. There, the PBGC made clear that it would use section 4047 to restore a terminated plan if an employer's post-termination benefit programs, taken together, "reflect an overall pension scheme which is designed to continue the [terminated] plans after the date of termination established under Title IV of ERISA." PBGC Record, p. 215.

Based on these three opinion letters, which have never been set forth in agency regulations,[26] the PBGC contends that it had identified the establishment of "abu-

---

**26.** At a hearing before the bankruptcy court on June 16, 1987 on LTV's application to enter into the 1987 CBA with the USWA, the PBGC's Executive Director testified that the Dec. 17, 1986 PBGC Opinion Letter had been published, although she did not state in what administrative news source. The Executive Director also stated that the policies expressed in the three opinion letters had never been adopted in the form of regulations promulgated by the agency. *See* PBGC Record, pp. 199–200, 207.

sive follow-on" pension plans as a factor sufficient in itself to support restoration of a plan under section 4047 prior to LTV Steel's adoption of the 1987 CBA Plans. Despite being informed of the PBGC's position, LTV Steel proceeded to enter into a post-termination collective bargaining agreement that incorporates what the PBGC contends are abusive follow-on plans. LTV Steel, on the other hand, contends that nothing in ERISA or the legislative history supports the PBGC's abuse theory and, to the contrary, that both ERISA and non–ERISA statutory and case law suggest that certain types of follow-on plans are permissible. Thus, LTV Steel argues, the PBGC's abuse theory is flawed as a matter of law.

In reviewing an agency's interpretation of the statute it administers, a court must address two questions. First, it must determine whether Congress had a specific intent as to the meaning of a particular phrase or provision. *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed. 2d 694 (1984). When analyzing the language and legislative history of the provision, a court is "not required to grant any particular deference to the agency's parsing of statutory language or its interpretation of legislative history." *Rettig v. PBGC*, 744 F.2d 133, 141 (D.C.Cir.1984). As the Supreme Court noted in *Chevron*, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9.

However, if it appears that "Congress did not actually have an intent" regarding the particular question at issue, *id.* at 845, 104 S.Ct. at 2783, and the court finds that Congress explicitly or implicitly delegated to the agency the task of filling the statutory gap, the court must uphold the agency's interpretation of the provision if it "represents a reasonable accommodation of conflicting policies committed to the agency's care by the statute." *Id.* (quoting *United States v. Shimer*, 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1901). There-

fore, if the court concludes that "Congress did not actually have an intent" with respect to what might be considered an abuse of the termination insurance system, it is required to grant a considerable degree of deference to the PBGC's reconciliation of competing statutory policies. *Nachman Corp. v. PBGC*, 446 U.S. at 373–74, 100 S.Ct. at 1732.

The legislative history accompanying the enactment of section 4047 reveals that Congress expressly identified only improvements in the financial condition of the plan and its sponsor as possible grounds for restoration. The House Conference Report simply states that the PBGC may cease termination proceedings "if the employer and the plan enjoyed a favorable reversal of business trends, or if some other factor made termination no longer advisable" and may restore a terminated plan "if, during the period of its operation by the trustee, experience gains [sic] or increased funding make it sufficiently solvent." H.R.Conf. Rep. No. 1280, 93d Cong.2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 5038, 5157–59.

With respect to abuses of Title IV's termination provisions, Congress expressed concern that an employer might "rely on the insurance [program] as a backup which enables it to be more generous in promising pension benefits to meet labor demands than would be the case if it knew that the benefits would have to be paid for entirely out of the assets of the employer," S.Rep. No. 383, 93d Cong., 1st Sess. 87, *reprinted in* 1974 U.S. Code Cong. & Ad.News at 4971, or that an operating employer might rely on plan termination "to renege on his agreement to contribute to the plan with impunity," and to shift the amount of his unfunded vested liabilities to the PBGC. 120 Cong.Rec. 4283 (1974). To discourage such potential abuses, Congress imposed limited termination liability on employers under section 4062 of ERISA. *See* S.Rep. No. 383, *reprinted in* 1974 U.S.Code Cong. & Admin.News at 4971. There is no direct reference in the legislative history that suggests Congress intended such abuses to

be remedied by restoration under section 4047.

Similarly, the legislative history of SEP-PAA, the 1986 amendments to ERISA, does not necessarily support the PBGC's claim that Congress recognized follow-on plans as an abuse of Title IV. Prior to the 1986 amendments, a plan sponsor was free to terminate its single-employer pension plan at any time. H.R.Rep. No. 241, 99th Cong., 2d Sess. 41, *reprinted in* 1986 U.S. Code Cong. & Ad.News 685, 699. The employer therefore controlled the incidence of any claim against the insurance program and, to some extent, the amount of such claim. *Id.* at 690; *see In re Pension Plan for Employees of Broadway Maintenance Corp.*, 707 F.2d 647, 651 (2d Cir.1983). Two specific abuses resulted. First, profitable employers with low net worth had terminated their plans under section 4041 in order to transfer their unfunded pension liabilities onto the PBGC. Second, profitable employers had terminated their pension plans in order to evade responsibility for paying certain benefits which participants and beneficiaries had earned, but which were not guaranteed by the PBGC. H.R. Rep. No. 241, 99th Cong., 2d Sess. 42, *reprinted in* 1986 U.S.Code Cong. & Ad. News at 699–700. Thus, in the "Findings and Declaration of Policy" which govern the SEPPAA amendments, Congress stated:

> (4) [T]he current termination insurance system in some instances encourages employers to terminate pension plans, evade their obligations to pay benefits, and shift unfunded pension liabilities onto the termination insurance system and the other premium-payers.

29 U.S.C. § 1001b(a)(4).

Congress, therefore, amended Title IV so that an employer could proceed by way of a "standard termination" only if the plan contained sufficient assets to pay all "benefit commitments," defined to include not only those amounts guaranteed by the PBGC, but also all additional amounts to which participants and beneficiaries were entitled under the terms of the terminated plan, to all participants and beneficiaries of the plan. 29 U.S.C. §§ 1301(a)(16), 1341(b); *see* H.R.Rep. No. 241, 99th Cong., 2d Sess. 46, *reprinted in* 1986 U.S.Code Cong. & Ad.News at 704 ("This requirement protects the PBGC, participants and beneficiaries against the types of abuses described" in the House Report.). Otherwise an employer would have to meet the stringent standards for a "distress termination," which include that the employer be in reorganization proceedings, that the bankruptcy court approve the termination, and that termination is required to permit the employer to continue in business. 29 U.S.C. § 1341(c)(2)(B); *see* H.R.Rep. No. 241, 99th Cong., 2d Sess. 46, *reprinted in* 1986 U.S.Code Cong. & Ad.News at 707 (these standards limit "access to the insurance system to cases of genuine need").

Thus, in passing the 1986 amendments to ERISA, Congress was primarily concerned with abuses resulting from voluntary terminations by employers. Congress intended to discourage these abuses by tightening the standards for voluntary terminations in order to limit the transfer of unfunded liabilities to the pension insurance system to cases of severe hardship. There is no indication in the legislative history of SEPPAA that Congress was concerned with the post-termination creation of follow-on plans by an employer whose plan had been involuntarily terminated by the PBGC.[27] The legislative history of ERISA, as amended by SEPPAA, does not mention the post-termination provision of nonguaranteed benefits as an "abuse" of the system that section 4047 was intended to remedy.

---

**27.** Senator Nickles, the Senate Floor Manager of the 1986 Amendments, did express concern "that companies may take action to impel involuntary termination of a plan by the PBGC and thereby limit the liability to plan participants and the PBGC." *See* 132 Cong.Rec. § 2726 (daily ed. Mar. 14, 1986). However, the Senator's remarks indicate that he understood that

"abuse" would be a ground for restoration after an involuntary termination only where an employer had acted deliberately in such a manner as to force involuntary termination. *Id.* The Senator did not identify the adoption of follow-on plans as an abuse that could support restoration.

Indeed, it appears that Congress first addressed the issue of post-termination replacement plans during consideration of the Pension Protection Act of 1987. During 1987 four congressional committees—the House Ways and Means Committee, the House Education and Labor Committee, the Senate Finance Committee, and the Senate Labor and Human Resources Committee—considered and passed pension plan termination-related legislation. The House Ways and Means Committee submitted a report to the House Committee on the Budget to accompany the Ways and Means Committee's recommendations on new legislation prohibiting "replacement" plans.[28] The report noted that "under present law" an employer, following a voluntary plan termination, "may continue or attempt to establish a plan that provides retirement benefits to retirees," including a plan "designed to provide the same benefits as the terminated plan" less PBGC benefits:

> *Replacement Plans.* Under present law, an ongoing entity can continue in operation on a profit making basis after transferring liability to the PBGC and without being liable for the amounts paid by the PBGC to plan participants. Similarly, an employer, after terminating a plan in a distress termination, may continue or attempt to establish a plan that provides retirement benefits to employees. Such a plan may be designed to provide the same benefits as the terminated plan less the benefits paid by the PBGC. The committee does not believe that the pension insurance system was intended to permit employers to shift liabilities of ongoing retirement programs to the PBGC. Similarly, the PBGC should not be liable for an employer's pension responsibilities if the employer is able to continue to provide retirement benefits.

**28.** The Ways and Means proposal was based in part on an Administration proposal, released in February 1987 and endorsed by the PBGC, that prohibited what was labeled "plan reestablishments":

> Except to the extent permitted by the PBGC, an employer (and its controlled group) would be precluded from establishing retirement

Report of the Committee on the Budget, House of Representatives, to Accompany H.R. 3545, together with Supplemental, Additional, and Minority Views, 100th Cong., 1st Sess. (Oct. 26, 1987) ("Budget Report"), p. 1010.

The Ways and Means Committee's proposal would have prohibited the establishment of "replacement plans" following a voluntary distress termination and have given the PBGC authority to bring an action to enforce this prohibition:

> *Replacement Plans.* The bill provides that, if all liabilities to the PBGC have not been satisfied following a distress termination, then the contributing sponsors (and members of the controlled group of the contributing sponsors) are precluded from establishing an arrangement under which retirement benefits are provided or providing for further accruals of retirement benefits under any arrangement previously established. The prohibition applies to all retirement benefits, including benefits provided under both qualified and nonqualified plans, other than benefits provided under a multi-employer plan. The PBGC may bring an action to enjoin any violation of this prohibition.

The prohibition applies during the 5-year period beginning on the termination date and, to the extent provided in regulations, the 1-year period ending on the termination date. It is intended that regulations will address situations under which, for example, an arrangement is established or benefits are increased under a preexisting arrangement prior to the plan termination in order to avoid the 5-year rule or to provide replacement benefits. To this end, it may be appropriate to provide that certain amendments or establishments of arrangements are presumed to be for this pur-

programs which, in whole or in part, provide substantially similar benefits within five years after termination of a plan that did not have adequate assets to provide PBGC guaranteed benefits.

"The Administration's Proposal on the Funding and Termination of Defined Benefit Pension Plans."

pose unless the employer establishes to the contrary, for example, by showing that the increase is consistent with past practices.

Budget Report, pp. 1011–1012. The three other Congressional committees involved did not adopt any provision concerning or prohibiting replacement plans.

The Conference Committee considered the Ways and Means proposal but refused to adopt it, noting the lack of a similar provision in the proposed legislation passed by the other committees. *See* Joint Explanatory Statement of the Committee of Conference, Title IX—Income Security and Related Programs, 15 BNA Pens.Rep. at 75–77 (Jan. 4, 1988). Thus, the Pension Protection Act contains no limitations on new benefit plans adopted after a plan termination. *See* Conference Report on December 22, 1987 Amendments, 133 Cong. Rec. H12185 (daily ed. Dec. 22, 1987).

In sum, the legislative history of ERISA, as amended by SEPPAA and PPA, reveals that Congress has addressed the issues of what constitutes an abuse of the pension termination system and how such abuses are to be remedied. Pre–1987 ERISA law contains no expression of congressional intent with respect to the establishment of pension plans following termination. In 1987 Congress considered an Administration proposal to restrict the use of replacement plans. The only congressional committee to adopt such a proposal recognized an employer's ability under current law to establish new benefit plans after a pension plan termination. Congress, however, failed to enact the committee's proposed prohibition on follow-on plans, which, in any event, was limited to cases of voluntary distress terminations. Thus, there are sufficient grounds to reject the PBGC's abuse theory as it relates to post-termination replacement plans as necessarily contrary to congressional intent. *See Chevron*, 467 U.S. at 943 n. 9, 104 S.Ct. at 2781 n. 9.

■ In section 4047 of ERISA, however, Congress authorized the PBGC to restore plans "in any case in which [it] determines such action to be appropriate and consistent with its duties under [Title IV]." 29 U.S.C. § 1347. Moreover, the legislative history of section 4047 provides that the PBGC may cease termination proceedings "if some other factor made termination no longer advisable." H.R.Conf. Rep. No. 1280, 93d Cong.2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 5038, 5157–59. Relying on this language in the statute and its history, the PBGC contends that Congress intended to grant the PBGC broad discretion to identify certain types of follow-on plans as abuses of the termination insurance system. However, even assuming, *arguendo*, that Congress assigned to the PBGC the task of filling the statutory gap and discouraging the adoption of certain post-termination pension arrangements, the Record does not support a finding that the PBGC's determination that the 1987 CBA Plans were abusive "represents a reasonable accommodation of conflicting policies" within Title IV and between Title IV and other non–ERISA laws.

First, the PBGC's exclusive reliance on its three prior opinion letters as expressions of the agency's policy against follow-on plans was unreasonable. Although an agency's "rulings, interpretations and opinions ... constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), the PBGC's three prior letters concern cases too factually dissimilar from the instant case to be of substantial assistance here. Two of the letters involved proposed voluntary terminations of plans to be followed by replacement plans that would continue employer benefits at levels equal to or greater than what had been provided prior to termination. Both proposals expressly contemplated the use of the PBGC's guarantee as an integral part of the employer's pension program. The third opinion letter also involved a voluntary termination contrived in concert with the establishment of new retirement arrangements that, together with the PBGC's guarantee, would have continued the termi-

nated plans after the termination date. By contrast, here, the PBGC effected an involuntary termination of LTV Steel's plans based on LTV Steel's inability to meet ERISA's minimum funding standards, the Plans' precarious financial condition, severe underfunding and an expected increase in underfunding, the expected additional cost of shutdown benefits, and the PBGC's desire to avoid an unreasonable deterioration of the Plans and an unreasonable increase in the PBGC's liability. Although LTV readily concedes that one of the principal goals of the filing of LTV's and LTV Steel's Chapter 11 petitions was the restructuring of LTV Steel's pension obligations, this case does not involve a purported voluntary termination contrived in concert with the establishment of new retirement arrangements designed to provide the same benefits for the future. Following the PBGC's involuntary termination of the Plans, LTV Steel agreed to the new programs in the face of a USWA lawsuit for benefits and the threat of a crippling strike. There is no direct evidence in the Record to indicate that LTV Steel sought to have the Plans terminated so that it could turn around and provide identical benefits to its workers and retirees after the PBGC had assumed most of the cost, whatever inference might be drawn from the sequence of events. Thus, the PBGC's prior opinion letters are of limited precedential value in assessing the abusiveness of pension arrangements established after an involuntary plan termination by the PBGC.

Second, the Record reveals that the PBGC's decision on the abusiveness of the 1987 CBA Plans did not take into consideration the fact that the 1987 CBA resulted in large part from LTV Steel's legal obligations under section 1113 of the Code and the USWA's pursuit of its rights under federal labor law. Section 1113 of the Code was enacted in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984),[29] and sets forth both procedural and substantive requirements for amendment of collective bargaining agreements during a Chapter 11 case.[30] Section 1113 is intended to encourage collective bargaining process, *In re Century Brass Products, Inc.*, 795 F.2d 265, 273 (2d Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986), and requires a debtor to negotiate in good faith over any proposed modification in a collective bargaining agreement. *Truck Drivers Local 807 v. Carey Transportation, Inc.*,

**29.** In *NLRB v. Bildisco & Bildisco*, the NLRB had commenced a petition in the Court of Appeals to enforce its order finding that Bildisco had violated the National Labor Relations Act by unilaterally changing the terms of a collective bargaining agreement and failing to make pension and welfare contributions and to remit dues to the union. Bildisco, a chapter 11 debtor, had meanwhile obtained permission of the bankruptcy court to reject its labor agreement. On appeal, the Supreme Court rejected the argument that an extremely stringent standard for rejection of a collective bargaining agreement be adopted, because the application of such a standard could jeopardize the debtor's ability to reorganize. *Bildisco*, 465 U.S. at 524–26, 104 S.Ct. at 1195–96. After the *Bildisco* decision, Congress concluded that as a matter of policy the Supreme Court had reached the wrong result on the merits. Therefore, Congress enacted section 1113 of the Code setting forth special standards and procedures for the rejection of collective bargaining agreements by Chapter 11 debtors.

**30.** Section 1113 of the Code provides in pertinent part:

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession ... shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protection that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause, and

(3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(b), (c).

816 F.2d 82, 89 (2d Cir.1987). Under Section 8(a) of the National Labor Relations Act, 29 U.S.C. § 158(a), mandatory subjects of bargaining include "pension and insurance benefits for active employees," *Allied Chemical and Alkali Workers of America v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 159, 92 S.Ct. 383, 387, 30 L.Ed.2d 341 (1971), and "wages, hours and other terms and conditions of employment ... [including] such 'non wage' benefits as ... group health insurance," *Connecticut Light & Power Co. v. N.L.R.B.*, 476 F.2d 1079, 1081 (2d Cir.1973). In addition, the Court of Appeals for the Second Circuit has held that retiree benefits may be the subject of mandatory bargaining during Chapter 11. *In re Century Brass Products, Inc.*, 795 F.2d at 274.

▮▮▮▮ Here, following termination the USWA commenced a lawsuit contending that the PBGC's involuntary termination of LTV Steel's pension plans violated section 1113 of the Code because as a result of termination some USWA retirees and active members ceased receiving benefits afforded them pursuant to the 1986 CBA. Although LTV Steel disputed the contention that an involuntary termination by the PBGC, a party not under the debtor's control, could constitute a violation of section 1113, LTV Steel recognized its duty to bargain in good faith with the USWA for an acceptable interim agreement. Collective bargaining produced the 1987 CBA in which the USWA shared the burdens of reorganization with LTV Steel by agreeing to substantial concessions. In deciding that the 1987 CBA Plans were abusive, the PBGC did not consider documents relevant to the USWA's adversary proceeding in the bankruptcy court or the impact of that cause of action on the legality of the 1987 CBA Plans as component parts of a settlement of that lawsuit.[31]

Third, the Record does not indicate whether the PBGC considered the fact that certain elements of the 1987 CBA Plans recapture benefits that are permissible under ERISA. In 1986, Congress enacted amendments to ERISA which provide that after either a voluntary or an involuntary termination of a pension plan the PBGC may appoint itself or another fiduciary to administer a trust, the so-called "4049 trust," to collect and distribute amounts in excess of the benefits guaranteed by the PBGC. *See* 29 U.S.C. § 1349. This section was enacted as a result of the efforts of some employers to limit their liability to plan participants, after a voluntary termination, to their liability for statutorily guaranteed payments. *See, e.g., Murphy v. Heppenstall Co.*, 635 F.2d 233, 239 (3d Cir.1980), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982). Thus, section 4049 demonstrates express Congressional intent that benefits in excess of the statutory guarantee be paid after termination.

The 1987 CBA expressly provides that certain benefits payable pursuant to the interim plans are to be offset by any equivalent benefit paid from a section 4049 trust. The PBGC did not establish a section 4049 trust following termination, and the Record does not indicate the PBGC's reasons for not appointing such a trustee or even whether the PBGC considered acting under section 4049 prior to learning the terms of the 1987 CBA.[32] The PBGC now

---

**31.** There is no basis for the PBGC's contention that "willingness" to fund pension plans constitutes "abuse" of Title IV that would warrant restoration. Congress has demonstrated, both in the 1986 amendments to ERISA and in other legislation passed in 1986 to require debtors to pay retiree health and life insurance benefits, that Congress intended that certain retiree benefits be paid in full. Further, LTV Steel's agreement to the pension provisions in the interim labor agreement when the alternative was a strike cannot be characterized as "willingness," *see, e.g., First Nat'l Bank of Cincinnati v. Pepper*, 454 F.2d 626, 632 (2d Cir.1972); *Union Pacific R.R. Co. v. Public Service Comm'n of Missouri*, 248 U.S. 67, 70, 39 S.Ct. 24, 25, 63 L.Ed. 131 (1918) (Holmes, J.), but rather as an effort to fulfill its fiduciary duty to its creditors. *See, e.g., Wolf v. Weinstein*, 372 U.S. 633, 649, 83 S.Ct. 969, 979, 10 L.Ed.2d 33 (1963).

**32.** Following the USWA's ratification of the proposed 1987 CBA, the PBGC sent a letter proposal to LTV Steel in which it offered to establish a section 4049 trustee. Recognizing that the Chapter 11 status of LTV Steel and other entities precluded payment of any amounts into the section 4049 trust until a plan of reorganization, the PBGC also offered to seek an agreement

contends that one component of the 1987 CBA Plans, the Individual Account Trust, which provides LTV Steel's retirees with between 90 and 100 percent of their non-guaranteed benefits, exceeds section 4049's 75 percent limit on the amount of non-guaranteed benefits that can be collected by a section 4049 trustee. However, the PBGC cannot point to any provision in Title IV that prohibits employees and retirees from seeking to collect 100 percent of the lost benefits.[33] In fact, at least one court has held that retirees may pursue such benefits through suit for breach of contract.

In *Murphy v. Heppenstall*, a group of retired USWA employees sued their employer following the involuntary termination by the PBGC of a pension plan established pursuant to a pension collective bargaining agreement. The retirees sought payment of non-guaranteed pension benefits. Focusing on contract provisions substantially similar to those in the 1986 Republic and J & L Pension Agreements, the Third Circuit held that the employer's obligation was not limited to the funds already contributed to the terminated pension plan. Rather, the Court held that the collective bargaining agreement established a contractual obligation to provide pension benefits, following a plan termination, in excess of those guaranteed by the PBGC. *Murphy v. Heppenstall*, 635 F.2d at 236. The PBGC filed a brief as amicus curiae in *Murphy v. Heppenstall* in which it supported the claims of the retirees to recover directly from the employer any non-guaranteed benefits to which the employer had contractually obligated itself and argued that nothing in ERISA imposes a cap on the payment of non-guaranteed benefits. *See Murphy v. Heppenstall*, 635 F.3d at 239. The Record does not indicate that the PBGC considered the holding of *Heppenstall* and the position it took in that case in reaching its conclusion that the 1987 CBA Plans constituted an abuse of Title IV.

The PBGC argues that the holding in *Heppenstall* cannot be stretched to permit the payment of additional retiree benefits under an ongoing retirement plan that also permits active employees to accrue or become eligible for benefits as if no termination had occurred. Thus, one of the PBGC's primary objections to the 1987 CBA Plans is that they take into account, for certain purposes, service earned by LTV Steel's employees prior to January 12, 1987.[34] However, nothing in ERISA prohibits benefit plans established after the termination of a defined benefit plan from crediting services from the date of hire for eligibility purposes. Indeed, under section 203(b)(1) of ERISA, all of an employee's years of service with an employer, except for certain limited exceptions, must be taken into account when computing the period of service under a defined benefit plan for purposes of determining the participant's nonforfeitable right to a percentage of his accrued benefit derived from the employer's contribution. *See* 29 U.S.C. § 1053(b)(1). Therefore, the PBGC's position that crediting pre-termination service

---

with the general unsecured creditors for immediate pre-funding of the trust to the extent of the projected value of the trust's claim. In addition, the PBGC advised LTV Steel and the USWA that it would accept the establishment of a future service defined contribution plan.

LTV Steel responded by letter noting that the PBGC was free to establish a section 4049 trust at any time and that the 1987 CBA expressly provided that if such a trust were established, it would offset benefits under the 1987 CBA programs. However, LTV also observed in its letter that the PBGC's proposal only addressed two of the eighteen major issues that had been resolved in the collective bargaining process.

**33.** The 1987 PPA Amendments to Title IV eliminate the section 4049 trust but give the PBGC

the right to collect 100 percent of non-guaranteed benefits. *See* 29 U.S.C. § 1362(b)(1)(A) (1988 Supp.).

**34.** In her affidavit submitted in support of the PBGC's opposition to LTV's motion in the bankruptcy court for authorization to enter into the 1987 CBA, the Executive Director of the PBGC stated that the "PBGC views a set of arrangements as substantially the same if it grants credit for purposes of benefit accrual, or for eligibility for certain types of benefits, for service rendered under the terminated plan or if it provides for the restoration or reimbursement of benefits which would have been paid under the terminated plan but which are not paid by the PBGC because of the limitations set forth in Title IV of ERISA." PBGC Record, pp. 194–95.

for determining eligibility constitutes an "abuse" of the pension system that would justify the PBGC's restoration of the terminated plans appears contrary to ERISA's general policies on service accrual. Moreover, the Supreme Court has recognized the important function that seniority serves in pension plans. *See, e.g., Coffy v. Republic Steel Corp.*, 447 U.S. 191, 100 S.Ct. 2100, 65 L.Ed.2d 53 (1980); *Alabama Power Co. v. Davis*, 431 U.S. 581, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977). By arguing that pre-termination service should not be credited under the new plans, the PBGC ignores a principle, well-established in case law and recognized in ERISA, that an employee generally receives credit for all years of service for pension purposes. The Record does not contain a basis for the PBGC's rejection of this principle in the context of post-termination replacement plans.

Finally, the Record does not contain such a detailed comparison of the terminated Plans and the 1987 CBA Plans as would establish a reasonable basis for the PBGC's conclusion that the latter constitute a *de facto* continuation of the former. The PBGC's comparative analysis, as set forth in the Record, consists of three paragraphs in the affidavit of C. David Gustafson ("Gustafson Affidavit"), the Manager of the PBGC's Actuarial Policy Division, submitted in support of the PBGC's opposition to LTV's motion in the bankruptcy court for authorization to enter into the 1987 CBA, and a five-page summary of the description of the 1987 CBA Plans that LTV submitted in connection with that motion.[35] In addition to noting the percentage of non-guaranteed benefits that would be paid present and future retirees under the IAT, the Gustafson Affidavit states that the Disability Income Benefits for Active Employees component of the new plans "allows participants in the [terminated] Plans who become disabled after the plan terminations to receive a benefit under similar

conditions and in an amount substantially similar to the amount that would have been provided before termination of the … Plans." PBGC Record, p. 225. The Gustafson Affidavit also states that the "Pre-Retirement Surviving Spouse Benefit, Extended Supplemental Unemployment Benefits and Lump Sum Severance Program components of the Follow-on Agreements all operate to replace benefits that were available under the … Plans that have either been reduced or are not paid by the PBGC as a result of plan termination." *Id.* Based on these findings, the SEPPAA Working Group concluded that the 1987 CBA Plans "essentially continue the terminated plans by providing substantially the same benefits and by paying amounts in excess of PBGC's guarantee limitations." PBGC Record, p. 642.

It is not disputed that one of the USWA's primary goals during the post-termination collective bargaining was the replacement of a large portion of the pension benefits and programs that were lost when the Plans terminated. The union and the company do not dispute that the 1987 CBA substantially achieved that goal. However, they contend that the problems created by the company's precarious financial condition and the threat posed by the union's ability to conduct a costly strike necessarily led to concessions by both sides that produced significant distinctions between the old and new plans. The USWA notes that the basic plan for active employees under the 1987 CBA is a defined contribution rather than a defined benefit plan, and, therefore, the new plan is not insured by the PBGC under Title IV. *See* 29 U.S.C. § 1321(b)(1). Thus, the 1987 CBA Plans do not increase the PBGC's financial exposure. Moreover, the USWA cites as additional significant distinctions the fact that (1) none of the new programs are guaranteed by the PBGC, (2) benefits under the new plans are provided through welfare plans, insurance companies or general cor-

---

**35.** The PBGC's Record also contains a twelve-page summary of the proposed 1987 CBA, dated August 1987, that the USWA leadership provided to the union's members to help them understand and to encourage them to ratify the re-

sults of the union's negotiations with LTV Steel. The USWA Summary is not the product of the PBGC's own analysis. *See* PBGC Record, pp. 1157–68.

porate assets, while all benefits under the terminated Plans were provided under a single defined benefit plan, (3) the new plans contain certain more restrictive age and service eligibility requirements, and (4) under the new plans, length of service does not necessarily increase the amount of some benefits. The Record, however, does not contain any analysis by the PBGC of the differences, as opposed to the similarities, between the old and new plans and, therefore, does not reflect a reasoned consideration of the concessions by LTV Steel's employees and retirees that lay beneath the differences between the two plans.

The PBGC has argued that if LTV is permitted to adopt these particular follow-on plans, "it could become routine for employers to file for bankruptcy primarily to escape their pension benefit obligations. Most significantly, the temptation for other major integrated steel producers to use Title IV as a tool for financing the kinds of operational restructuring they need to remain competitive in the industry would be virtually irresistible." PBGC Memorandum in Support of its Motion for Summary Judgment ("PBGC Memorandum"), p. 63. While the PBGC's argument is not devoid of logic, it is unsupported by any facts or even expert opinion in the Record, and the Record does not contain any analysis of the extent of any such threat, if realized.

In sum, the legislative history of Title IV does not support the PBGC's characterization of post-termination pension plans as abuses of the pension plan termination insurance program. However, even if the PBGC does have the discretion to identify certain post-termination plans as abusive of Title IV, the Record does not suggest that the PBGC's characterization of the 1987 CBA Plans as abusive was the product of a

reasoned consideration of factors particular to LTV Steel's bankruptcy, of competing policies within Title IV, or of the obligations imposed on LTV Steel by federal bankruptcy and labor law. The PBGC's failure even to address these issues was arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866; *Burlington Truck Lines, Inc. v. United States*, 371 U.S. at 172–74, 83 S.Ct. at 248–49. Therefore, on the administrative record now before this court, restoration cannot be upheld on the ground that the 1987 CBA Plans constitute an abuse of Title IV.

### B. *LTV Steel's Improved Financial Condition*

■ The PBGC's Restoration Notice cited a substantial improvement in the financial condition of LTV Steel since the Plans were terminated as a second factor warranting restoration.[36] The legislative history of section 4047 expressly recognizes a plan sponsor's "favorable reversal of business trends" as sufficient to "ma[k]e termination no longer advisable." *See* H.R. Conf.Rep. No. 1280, 93d Cong.2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 5038, 5157–59. LTV does not contend that the PBGC would not be justified in restoring a terminated plan or in abandoning termination proceedings if the plan sponsor became financially able to fund the plan. Restoration under such circumstances is wholly consistent with SEPPAA's declaration that "the transfer of unfunded pension liabilities onto the single-employer pension plan termination insurance system [occur] only in cases of severe hardship." 29 U.S.C. § 1001b(c)(4). However, LTV and certain intervenors object to the PBGC's conclusion that LTV Steel's financial condition had improved so substantially

---

**36.** The Record partially belies the PBGC's contention that an alleged improvement in LTV Steel's financial improvement was an important factor in the restoration. An early draft of an Executive Summary dated September 18, 1987 concerning the SEPPAA Working Group recommendation to restore the Plans states, "During their deliberations on this matter, the members of the working group indicated that they would have recommended restoration in response to

LTV's abuse of the pension insurance system, whether or not the company's financial circumstances had changed." *See* PBGC Record, p. 672. In the final draft of this Executive Summary, which was forwarded to the Executive Director, this sentence was changed to read, "LTV's improved financial circumstances were not the primary basis for the recommendation that the plans be restored." *See* PBGC Record, p. 638.

during the eight months following termination that it could afford to fund the Plans.

In support of its objections to the PBGC's calculation of the cost of restoration and of LTV Steel's ability to fund the Plans, LTV Steel has submitted affidavits from its financial officers that contain cost calculations that differ greatly from the PBGC's figures. The PBGC correctly objects to the submission of these affidavits as beyond the scope of the administrative record to which review on this motion for summary judgment is confined. However, the Record alone establishes that the PBGC's determination that LTV Steel can afford the Plans was arbitrary and capricious. This conclusion is based on the PBGC's failure to (1) lay an adequate foundation in the Record for its conclusion that LTV Steel's financial condition had improved, which differentiated between the company's financial condition at the time of restoration as opposed to termination, (2) set forth in the Record the basis for two critical assumptions it adopted in calculating the costs of restoration, and (3) consider the requirements under ERISA concerning the financial viability of single-employer pension plans.

The PBGC's conclusion that the financial condition of LTV Steel substantially improved during the second half of 1986 and the first half of 1987 appears to be based solely upon LTV Steel's accumulation of cash as a result of its status as a debtor under Chapter 11. Thus, the PBGC points to data in the Record showing that LTV Steel was able to make substantial cash advances to LTV; spend almost $150 million for capital improvements; pay off $433 million in prepetition bank debt; make payments of $234.5 million in prepetition employee-related expenses; fund the 1987 CBA Plans; and pay its post-petition accounts on a timely basis. Moreover, the Record shows that LTV Steel's operating results for the first five months of 1987

exceeded the optimistic forecasts in the LTV 1987–1988 Operating Plan. The PBGC contends that these data in the Record document the substantially improved financial circumstances upon which the PBGC based its restoration decision.

The Record does not support the PBGC's decision. First, the Record does not explain the weight the PBGC attaches to the Chapter 11 status of a plan sponsor when it reviews a company's financial health. Here, the improvements in LTV Steel's financial condition were unremarkable for a Chapter 11 debtor and were foreseeable at the time the Plans were terminated. Indeed, to a large extent, termination and restoration were based on the same two-year business plan.[37] Thus, the only additional information the PBGC possessed when it decided to restore the Plans that it did not possess at the time of termination was the knowledge that LTV Steel's actual operating results for the first five months of 1987 had exceeded the Operating Plan's projections. Based on LTV Steel's improved financial results over this five-month period, the SEPPAA Working Group concluded that "LTV Steel alone would be able to fund [the Plans] in the near future" even though it conceded that it did "not have sufficient data to predict LTV Steel's long-term cash flow with any certainty." PBGC Record, p. 645.

The PBGC failed to establish a reasonable basis for its contention that improvements in LTV Steel's financial condition between January 1987 and September 1987 justified restoration. First, it was not reasonable for the PBGC to rely on improvements in LTV Steel's financial results that were caused by factors that were foreseeable at the time of termination—such as the protection from creditors and suspension of interest payments provided by the automatic stay and LTV's anticipated shutting down of unprofitable and noncompetitive steel operations. Second, in assessing LTV

---

**37.** The PBGC's SEPPAA Working Group, at the first meeting to discuss *restoration,* acknowledged, in reference to the 1987–1988 Operating Plan, that at the time of the decision to terminate the Plans "financial analysis presented to the group based on LTV's most optimistic projections indicated that LTV could not make the required contributions to meet the minimum funding requirements." PBGC Record, p. 645.

Steel's early 1987 results, it was not reasonable for the PBGC to rely on such short term factors as the work stoppage at one of LTV Steel's major competitors, USX, without analyzing the extent to which such factors could reasonably be expected to benefit LTV Steel over the long run. In sum, the Record does not indicate that the PBGC's conclusion as to LTV Steel's improved financial condition was based on the agency's consideration of factors that were not foreseeable at the time of termination and that were reasonably expected to continue to benefit the company in the future.

Based on its observations concerning LTV Steel's improved financial condition, the PBGC determined that LTV Steel could afford to meet its minimum funding obligations to the Plans. This conclusion was based largely on a summary financial analysis prepared by a PBGC staff member and reviewed by the PBGC's outside financial advisor, Goldman, Sachs & Co. The PBGC's analysis relied on LTV's own figures and did not attempt to "project economic or other factors that will affect LTV in the future." PBGC Record, p. 12. In its analysis, the PBGC assumes that LTV Steel's cash flow in 1988 will be $265 million before the attempted restoration. The PBGC analysis further assumes that in 1988 the contribution required for the three pension plans will be $260 million; that $90 million, the cost of the 1987 CBA Plans should be subtracted from that figure because that sum duplicates amounts which would be paid into the restored Plans; and that $50 million in savings from USWA job reduction and related concessions in the 1987 CBA may also be subtracted. The PBGC's calculation results in an incremental cash cost of restoration of $120 million in 1988.

The PBGC's calculation was based on two fundamental, yet unexplained and unexamined assumptions: (1) that the $50 million in savings from job reductions conceded by the USWA in the 1987 CBA would be preserved whether or not the Plans were restored and (2) that LTV Steel would be able to obtain waivers from the IRS for its minimum funding contributions for the years 1984–1986. As for the $50 million in

job reductions, the PBGC Financial Summary assumed that "further bargaining [would] preserve[ ] the job reductions." PBGC Record, p. 12. The Record, however, does not support this assumption. The $50 million savings in job reductions is dependent upon the continued viability of the 1987 CBA. Upon restoration, LTV Steel or the USWA can exercise its right under the 1987 CBA's "snapback" provision to void that agreement and revive the 1986 CBA, thus retracting the $50 million savings. The Record sheds no light on the PBGC's justification for its assumption. Without some insight into the agency's rationale and in light of the intensity and bitterness that accompanied the 1987 collective bargaining sessions between LTV Steel and the USWA, no basis is found in the Record to support a conclusion that the USWA would leave such concessions in place once its members began receiving full benefits under the Plans and collective bargaining began anew.

The Record is similarly devoid of any justification for the PBGC's assumption that LTV Steel would be able to obtain waivers for its outstanding minimum funding contributions. Termination of the Plans followed shortly after the IRS had refused to grant LTV Steel a waiver for the 1985 plan year and had revoked its waiver for the 1984 plan year. Thus, upon restoration, LTV Steel would have been subject to an immediate claim for past due minimum contributions for the 1984–1986 plan years, totaling more than $600 million. The Record does not indicate what factors the IRS would consider in responding to waiver requests or on what grounds the PBGC based its conclusion that the IRS would respond favorably to such requests. Thus, the Record provides no basis for a finding that the PBGC's assumption on the waiver issue was reasonable.

Apart from the absence of adequate justification for the PBGC's calculations, the Record is also silent on (1) the standards that the PBGC applies to determine whether a Chapter 11 debtor, like LTV Steel, can afford to fund its pension plans and (2) the possibility that the Plans might have to be

reterminated. As to the first issue, the Record does not specify, for example, what percentage of a steel manufacturer's cash flow is normally allocated to pension funding.[38] Therefore, the Record does not provide an objective comparative basis for the PBGC's conclusion that LTV Steel is able and should be required to fund the Plans. As to the second issue, it appears that the PBGC did not consider the relevance to a restoration decision of Title IV's standards governing voluntary and involuntary terminations. Several of the intervenors have argued that if the PBGC intends to restore the Plans on the grounds that LTV Steel can afford to fund them, the PBGC should be required to demonstrate, at minimum, that the Plans will not be reterminated in the near future. This would require the PBGC to demonstrate more than simply that in absolute numbers LTV Steel's cash flow would be sufficient to fund the Plans. Because the PBGC did not address the prospect of retermination, the Record does not establish grounds for the PBGC's failure to apply the termination standards for financial viability in reaching its decision that LTV Steel could fund the Plans.

The PBGC has attempted to shift the focus away from the gaps in its financial analysis by contending that "the ability to comply fully with ERISA's minimum funding standard is not a factor PBGC has determined must be shown in order for restoration to be appropriate."[39] PBGC Memorandum, p. 62. The PBGC's attempt to minimize the importance of ERISA's minimum funding requirements is unavailing. Under ERISA the short-term financial health of a plan is irrelevant if the plan is not viable over the long term. ERISA is intended to encourage long-term plans, not plans whose lives are measured in months or even years. So-called "pay-as-you-go" plans are illegal under the statute. *See* 29 U.S.C. § 1002(31). The IRS regulations that a plan must meet in order to be guaranteed by the PBGC, *see* 29 U.S.C. § 1321, also demand long term viability:

> The term "plan" implies a *permanent* as distinguished from a temporary program. Thus, although the employer may reserve the right to change or terminate the plan, and to discontinue contributions thereunder, the abandonment of the plan for any reason other than business necessity *within a few years after it has taken effect* will be evidence that the plan from its inception was not a bona fide program for the exclusive benefit of employees in general.

I.R.C. Reg. 1.401–1(b)(2) (emphasis added). The PBGC has not offered a compelling reason why Title IV's concern for the long term viability of pension plans should not apply with equal force in the context of a restoration decision.

In conclusion, the Record does not indicate that the PBGC's determination that LTV Steel's financial condition had improved to the extent that it could fund the Plans was the result of reasoned and intelligible decisionmaking by the agency. The PBGC did not attempt to justify through critical analysis its assumptions concerning the costs of restoration. The PBGC failed to set forth adequately a basis for its conclusion that LTV Steel's financial condition had improved in ways that were not fore-

---

**38.** LTV Steel's projected net cash flow for 1988 was $265 million, and the PBGC calculated the net incremental cost of restoration to be $120 million. Therefore, the PBGC's restoration decision implies that if the annual cost of restoration is less than 50 percent of the debtor's projected annual cash flow, restoration is appropriate. The court cannot analyze whether this implication is consistent with ERISA since the PBGC has never addressed, formally or informally, the question of what percentage of a Chapter 11 debtor's cash flow should be deemed adequate to fund the full cost of the debtor's minimum funding obligations.

**39.** In its memorandum in support of the instant motion, the PBGC also states: "In this case, for example, even without further funding, the Plans have assets sufficient to pay full Plan benefits for several years." PBGC Memorandum, p. 62. However, the PBGC was aware when it terminated the Plans that the Plans had "assets to carry them for approximately 4 to 5 years without additional contributions." PBGC Record, p. 4. Thus, the fact that the Plans had sufficient assets to pay full benefits for several years was known at the time of termination and, in any event, is irrelevant to a determination of whether LTV Steel can afford to fund the Plans.

seeable at the time of termination and that could reasonably be attributed to long term factors. Therefore, the PBGC's decision to restore the plans on this ground was not the product of the agency's thorough examination of all relevant factors, did not contain an adequate explanation of the agency's assumptions and was, therefore, arbitrary and capricious. On this administrative record, restoration cannot be upheld on the grounds that LTV Steel can afford to fund the Plans.

### VIII. *The PBGC's Procedures Were Inadequate*

One of the most troublesome issues presented in this case is the process that brought the parties before this court. The PBGC's involvement in LTV's bankruptcy escalated sharply after it commenced involuntary termination proceedings and obtained a court order terminating the Plans in accordance with section 4042's detailed standards and procedures. Thereafter, the PBGC, acting both as a creditor and an adversary, monitored LTV's efforts at reorganization and opposed LTV's efforts to conclude the 1987 CBA. During August and September 1987, the PBGC returned to its role as a regulator and restored the Plans, thereby returning to LTV the obligation to make several hundred million dollars in annual contributions to pension plans whose restructuring had been one of LTV's primary goals in entering bankruptcy. In so doing, the PBGC exercised its express authority under section 4047—a single-paragraph provision in ERISA that permits the PBGC to take actions of such consequence without providing the agency even the most minimal of procedural and substantive guidance.

When one juxtaposes the circumscription of sections 4041 and 4042 governing plan terminations with the open-ended discretion of section 4047, it becomes apparent that the scope and precision of ERISA that the Supreme Court admired when it referred to ERISA as a "comprehensive and reticulated statute," *Nachman Corp. v. PBGC*, 446 U.S. at 361, 100 S.Ct. at 1726, does not yet extend to section 4047. Based upon the limited legislative history of Title IV's res-

toration provision, Congress has yet to address fully the circumstances, standards and procedures under which restoration should occur. It has been demonstrated above that neither of the substantive grounds asserted by the PBGC can support restoration on this Record. The final inquiry under the APA's "arbitrary and capricious" standard of review is whether the PBGC's procedural approach to restoration produced a complete, reviewable record and guaranteed fairness to LTV. *Overton Park*, 401 U.S. at 417, 91 S.Ct. at 824.

LTV asserts three basic challenges to the PBGC's procedural approach. First, LTV claims that the PBGC improperly decided to restore the Plans without first following formal rulemaking procedures to establish standards governing plan restorations. Second, LTV contends that it was denied due process because the PBGC is a biased adjudicator and, therefore, should be disqualified from adjudicating restoration. Third, LTV argues that the PBGC's fact-finding was inadequate. The PBGC responds that section 4047 authorizes the agency to make such determinations as the restoration decision through informal adjudication and that it therefore was not required to conduct a formal hearing or to promulgate rules. Further, the PBGC contends that its prior opinion letters put LTV on notice that the agency was opposed to follow-on plans and that LTV had adequate opportunity during the summer of 1987 to present its views on restoration to the PBGC.

The PBGC arrived at its decision to restore the Plans through informal agency adjudication. The APA defines "adjudication" as "agency process for the formulation of an order." 5 U.S.C. § 551(7). Adjudication can be formal, as where the agency conducts "trial-type" proceedings, or informal. Since section 4047 of ERISA is silent on the procedures that the PBGC should observe in reaching a decision to restore a terminated plan to its pretermination status, the PBGC was not obligated to conduct "formal" adjudication, which is required under the APA only when a decision is "required by statute to be determined on

the record after opportunity for an agency hearing." 5 U.S.C. § 554(a); *see also* 5 U.S.C. §§ 554(c)(2), 556(a), 557(a). Moreover, since "the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion." *NLRB v. Bell Aerospace Company Division of Textron, Inc.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974), the PBGC acted within its authority in proceeding to restore the Plans through informal adjudication.[40]

■ LTV's claim that the PBGC's statutory mandate under ERISA prevents the agency from acting as an impartial arbiter is premised on the assumption that the PBGC's primary motive in restoring the Plans is to profit from the 1987 PPA amendments to ERISA when the Plans are reterminated, which LTV contends is inevitable. LTV cites the settled principle of administrative law that where an adjudication is tainted by the decisionmaker's bias it must be invalidated. *See, e.g., Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242–43, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980); *Porter v. Califano,* 592 F.2d 770, 780–82 (5th Cir.1979). The PBGC's statutory conflict of interest derives, LTV argues, from Congress' failure to give the PBGC access to the coffers of the United States to fulfill its obligations. *Cf.* Federal Deposit Insurance Corporation, 12 U.S.C. §§ 1817(d), 1821; Federal Savings and Loan Insurance Corporation, 12 U.S.C. §§ 1785, 1727. Instead, the PBGC is dependent upon premiums, transfers of assets, and recoveries from claims against plan sponsors. Because the PBGC must maximize its recoveries against plan sponsors, LTV contends, it cannot act as the impartial arbiter of restoration to which LTV is entitled as a matter of due process. LTV argues that the PBGC's structural conflict of interest is similar to that of ERISA trustees of multiemployer plans recognized in *United Re-tail & Wholesale Employees v. Yahn & McDonnell, Inc.,* 787 F.2d 128, 141–42 (3d Cir.1986), *aff'd by an equally divided Court,* —— U.S. ——, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987), and has been recognized in the context of termination. *See In re Pension Plan for Employees of Broadway Maintenance Corp.,* 707 F.2d at 651–52 (ERISA requires PBGC to seek court approval for involuntary termination because choice of termination date has financial implications for PBGC that may conflict with interests of plan beneficiaries).

As discussed above, if the Plans were restored and then reterminated and if the PPA, in particular the amendments to section 4062, were deemed to be applicable to the Plans, the PBGC's claim for termination liability could increase by $800 million. Although recognizing the difficulty of discovering indicia of bad faith in an administrative record compiled by the agency itself, there is a genuine reluctance to ascribe improper motives to a government agency in the absence of adequate proof. *Cf. Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975) (contention that combination of investigative and adjudicative functions creates unconstitutional risk of bias in agency adjudication must overcome presumption of honesty and integrity in those serving as adjudicators). Here, the PBGC contends that it restored the Plans to further the purposes of Title IV, and there is no indication in the Record that the impending amendments to ERISA influenced the PBGC's decision or that the PBGC relied upon the adoption of the proposed amendments. Moreover, as discussed above, whether the PBGC would be able to invoke the PPA amendments to increase its claim on behalf of a plan that was terminated and restored prior to their enactment and thereafter quickly reterminated is an open question not presently

---

**40.** The Supreme Court decisions recognizing agencies' discretion to choose between rulemaking or adjudication do not limit that discretion to cases in which the agency conducts formal adjudication. *NLRB v. Bell Aerospace Co. Division of Textron, Inc.,* 416 U.S. at 294, 94 S.Ct. at 1771; *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).

Courts have recognized agency discretion to choose between rulemaking and adjudication regardless of whether "trial-type" adjudicatory proceedings are utilized. *See Coos–Curry Electric Cooperative, Inc. v. Jura,* 821 F.2d 1341, 1346 n. 5 (9th Cir.1987); *Capitol Technical Services, Inc. v. FAA,* 791 F.2d 964, 971 n. 46 (D.C. Cir.1986).

before the court. Speculation about the PBGC's recovery against LTV in the event of retermination, therefore, cannot support LTV's claim of agency bias.[41]

▪ Restoration is a regulatory act that does not permit the PBGC to recover on its claims against a plan sponsor or to increase the amount of its claims. If anything, restoring a plan to a financially unsound company potentially increases the PBGC's loss by allowing employee benefits to accrue against an employer with dwindling assets and insufficient cash flow. On the other hand, restoring a plan to a financially healthy plan sponsor simply ensures that participants will receive their full benefits and is consistent with the purposes of Title IV. Unlike involuntary termination by the PBGC and claims for withdrawal liability by ERISA trustees, restoration does not involve fixing a liability against the plan sponsor.[42] Thus, apart from LTV's assertion that the PBGC wrongly intends to enhance its claim by restoring, reterminating, and invoking the benefits of the PPA, there is nothing in ERISA that disqualifies the PBGC from acting as the impartial arbiter of a restoration decision.

▪ There is substantial merit, however, to LTV's third and final claim of procedural error concerning the inadequacy of the PBGC's factfinding. This claim encompasses the PBGC's failure to develop a complete, reviewable record, its failure adequately to apprise LTV of the grounds for restoration and its failure to give LTV adequate opportunity to rebut those grounds. Here, the Record shows that the PBGC's gathering of facts pertaining to LTV Steel was defective.

Even though it adjudicated restoration without a formal hearing, the PBGC was required to observe the "fundamental proposition of administrative law that interested parties must have an effective chance to respond to crucial facts." *Carson Prods. Co. v. Califano*, 594 F.2d 453, 459 (5th Cir.1979). In several opinions, the Supreme Court has articulated the minimum procedural safeguards that must accompany agency decisionmaking. Thus, the Court has declared, "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959). Beyond that, "[a] party is entitled ... to know the issues on which decision will turn and to be apprised of the factual material on which the agency relies for decision so that he may rebut it." *Bowman Transp. v. Arkansas–Best Freight Sys.*, 419 U.S. at 288 n. 4, 95 S.Ct. at 443 n. 4. And "[t]hose who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command." *Morgan v. United States*, 304 U.S. 1, 18–19, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938). Finally, the Court has held that the opportunity for response must come "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct.

---

**41.** One of the intervenors has asserted that, because of its institutional interest and in light of public statements by the PBGC's Executive Director the PBGC was predisposed to oppose the 1987 CBA Plans and thus could not function as an impartial arbiter in the restoration dispute. However, the Supreme Court has made clear that a decisionmaker is not disqualified "simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Hortonville Joint School District No. 1 v. Hortonville Education Ass'n*, 426 U.S. 482, 493, 96 S.Ct. 2308,

2314, 49 L.Ed.2d 1 (1976) (quoting *United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941)). Here, there has been no showing that would bar the PBGC from adjudicating restoration of the terminated Plans.

**42.** If and when the PBGC does recover on its claims for termination liability against LTV, the amount of the PBGC's recovery will be controlled by the termination provisions of Title IV, *inter alia*, 29 U.S.C. §§ 1341, 1342, 1362 and 1368, and the processes of adjusting claims in bankruptcy.

1187, 1191, 14 L.Ed.2d 62 (1965).[43]

Moreover, the Court of Appeals for this Circuit has held that in the absence of specific regulations, an administrative agency must (1) proceed in accordance with ascertainable standards and (2) provide a statement showing the agency's reasoning when applying those standards. *Patchogue Nursing Center v. Bowen*, 797 F.2d 1137, 1143 (2d Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987); *Holmes v. New York City Housing Authority*, 398 F.2d 262, 265 (2d Cir.1968). Although the PBGC acted within its authority in attempting to evolve standards for restoration during an ongoing restoration proceeding, *SEC v. Chenery Corp.*, 332 U.S. at 203, 67 S.Ct. at 1580, it nevertheless had an obligation to set forth those standards with sufficient clarity to permit LTV to challenge them. *Id.* at 196, 67 S.Ct. at 1577.

The PBGC's Restoration Notice simply informed LTV that the Plans were being restored because of LTV's adoption of abusive follow-on plans and LTV's improved financial circumstances. However, prior to issuing the Restoration Notice, the PBGC never informed LTV of the standards it had developed to determine whether the 1987 CBA Plans were impermissible *de facto* continuations of the terminated plans. Apart from three conclusory paragraphs in an affidavit submitted by the PBGC's actuary describing the similarities in terms of benefits and service accrual provided under the old and new plans, the Record does not contain any written communication to LTV setting forth a detailed comparison of the two sets of plans and identifying specific components of the new plans that, under the PBGC's standards, contravene the policies of Title IV.[44] As discussed above, the PBGC's three prior opinion letters were factually too dissimilar to provide adequate notice to LTV of the agency's objections to the 1987 CBA Plans.

As for the second justification asserted for restoration, the PBGC did not inform LTV that it was considering the improvement in LTV Steel's financial condition as a basis for restoring the Plans. Moreover, as discussed above, the Record does not disclose the standards that the PBGC applies when it evaluates the financial condition of a Chapter 11 plan sponsor and determines that the sponsor can afford to fund its previously terminated plans. The Record contains only the PBGC's comparison of absolute numbers for LTV Steel's cash flow and the minimum funding costs of the restored Plans. Thus, even if LTV had been aware that the PBGC was considering its improved financial condition as a basis for restoration, without some indication from the PBGC as to the standards and assumptions under which the agency conducted its financial analysis, LTV would have had a difficult time rebutting the agency's numbers in a rational and meaningful manner.

43. *See also CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1159–60 (D.C.Cir.1987) ("A precept fundamental to the administrative process is that a party must have an opportunity to refute evidence utilized by the agency in decisionmaking affecting his or her rights."); *cf. Belland v. PBGC*, 726 F.2d 839, 845 n. 10 (D.C.Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984) (adequacy of PBGC's fact-finding procedure with respect to determination of plan termination date was not disputed and all parties had been accorded "the opportunity to submit relevant information"); *A–T–O, Inc. v. PBGC*, 634 F.2d 1013, 1023–24 (6th Cir.1980) (no facts in dispute and plaintiff had "full opportunity" through its written submissions and briefs to argue the law).

44. The Minutes of the August 6 and 10, 1987 meetings of the SEPPAA Working Group indi-

cate that the Group "decided not to [recommend restoration of] the Republic Salaried Plan [one of the four terminated LTV Steel plans] at this time because PBGC expects to recover 100 per cent of the plan asset insufficiency for that plan, and because of the uncertain impact of the plan's exposure for lump sum payments on its ability to meet annual benefit payments from required minimum funding contributions." PBGC Record, p. 645. It would appear that the PBGC's reasons for restoring the other plans— the abusiveness of the 1987 CBA Plans and LTV's improved financial condition and "willingness" to fund employee benefits—would apply with equal force to the Republic salaried plan. Thus, in the absence of ascertainable standards concerning follow-on plans, it is difficult to understand the PBGC's decision not to restore the fourth plan.

The PBGC contends that LTV was made aware of the agency's opposition to follow-on plans as early as May 1987 and that LTV had the opportunity on at least five separate occasions to present its views on restoration. PBGC officials did meet with LTV officials on July 9, 10 and 13, 1987 and again on September 19 and 21, 1987. However, nothing in the Record suggests that those meetings were anything more than settlement discussions concerning the PBGC's ongoing litigation efforts to block the 1987 CBA and the administrative responses to the 1987 CBA Plans that the agency was then considering.[45] The PBGC never requested from LTV a written statement setting forth its opposition to restoration on the grounds being considered by the PBGC. Indeed, LTV was not informed that the Plans were being restored in part because of its improved financial circumstances and ability to fund the Plans until it received the Restoration Notice. Thus, not only did the PBGC fail to offer LTV any guidance on how to submit its opposition to restoration to the agency, it also failed to inform LTV of all the factors on which it sought to base its restoration decision until after it had issued a final decision. *Cf. National Organization for Women, Washington, D.C. Chapter v. Social Security Admin.*, 736 F.2d 727, 740–41 (D.C.Cir.1984) (*per curiam*) (Robinson, C.J., concurring). Several informal meetings with the PBGC and the agency's open-ended invitation to LTV that it would "be happy to consider any additional information you might wish to supply," PBGC Record, p. 1572, fall far short of the minimum amount of process that should have accompanied a decision of such enormous consequence to LTV, its creditors and the USWA.

Thus, it appears that here the PBGC obtained its facts primarily through its dual status as a creditor in LTV's bankruptcy proceeding and an adversary in litigation against LTV to block the 1987 Plans. In addition to financial information LTV provided to its creditors and LTV's court filings, the PBGC relied upon public documents LTV filed with the SEC. It does not appear that the PBGC exercised its investigative authority under ERISA to gather data directly from LTV.

In sum, in reaching its decision to restore the Plans, the PBGC did not follow procedures that would have afforded LTV a meaningful and timely opportunity to rebut the factual bases for the restoration decision. The PBGC did not adequately specify its objections to the 1987 CBA Plans as *de facto* continuations of the terminated plans so as to give the company a framework for a counter-presentation demonstrating the significant differences between the old and new plans. The PBGC did not inform LTV that it intended to base restoration in part on the company's improved financial condition nor did it seek up-to-date information regarding the company's financial prospects for the future.[46] In view of the consequences of restoration, the PBGC's procedures were severely defective. *Cf. National Organization for Women*, 736 F.2d at 745 (Mikva and McGowan, J.J., concurring) (*Overton Park* procedures must be "severely defective" to justify *de novo* review).

### Conclusion

The special nature of reorganization proceedings and the protection to be given to the reorganization process are well recognized: "The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco*, 465 U.S. at 528, 104 S.Ct. at 1197. "In

---

**45.** In addition to restoration, it appears that the PBGC was also considering (i) reducing the amount of checks being dispersed to retirees by the amounts made up in the 1987 CBA Plans, (ii) continuing pending litigation over the 1987 CBA Plans, and (iii) taking no further action. PBGC Record, pp. 666, 668.

**46.** Although the PBGC was aware that LTV had announced it would release the company's seven-year business plan early in October 1987, PBGC Record, p. 638, the agency decided to go ahead with restoration based on the company's actual results for the first half of 1987 and the company's projections in the 1987–1988 Operating Plan.

proceedings under the reorganization provisions of the Bankruptcy Code, a troubled enterprise may be restructured to enable it to operate successfully in the future." *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed. 2d 515 (1983). "The Code expresses a preference toward reorganization rather than liquidation; a viable reorganization plan typically provides greater payment to creditors while preserving the economic life of the entity." *Matter of A & B Heating & Air Conditioning,* 823 F.2d 462, 465 (11th Cir.1987).

Against this well-settled preference for and deference to reorganization proceedings are placed the efforts of a government agency to exercise for the first time its express authority under ERISA to take action potentially radically at odds with the goals and interests of those parties attempting to reorganize a company billions of dollars in debt. Enacted "to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated," *Nachman Corp. v. PBGC,* 446 U.S. at 374, 100 S.Ct. at 1732–33, Title IV of ERISA creates a pension plan termination insurance program that expressly contemplates payment of the PBGC's guarantee only in cases of severe hardship. There is no indication in the legislative history or in the language of the statute that Title IV was intended to be used as a source of funds available to financially troubled employers seeking to shed their pension liabilities, reorganize and assure higher recoveries for their creditors.

If Congress intended to create a government subsidy for reorganizing companies as a matter of federal industrial policy, a direct and explicit finding in that regard would be appropriate. Congress should not wait for reorganizing companies to bankrupt an underfunded government corporation already $4 billion in debt, PBGC Record, p. 227, and leave to the courts the task of discerning the congressional purpose with respect to an issue of fundamental importance to the survival of many ailing American industries and the welfare of their employees. In the absence of a clear expression of congressional intent to the contrary, the PBGC's unmistakable authority to restore terminated plans must be recognized. For the reasons stated above, these are the considerations that have led to today's holding that restoration by the PBGC of the Plans is not barred by the automatic stay and can be adjudicated outside the framework of a bankruptcy proceeding without subjecting the agency to a contempt proceeding.

At the same time, a government agency must act in accordance with intelligible standards and procedures reasonably designed to guarantee fundamental fairness. Judicial review is limited to ensuring that the agency adheres to these precepts. As Judge Bazelon wrote:

> Judicial review must operate to ensure that the administrative process itself will confine and control the exercise of discretion. Courts should require administrative officers to articulate the standards and principles that govern their discretionary decisions in as much detail as possible. Rules and regulations should be freely formulated by administrators, and revised when necessary. Discretionary decisions should more often be supported with findings of fact and reasoned opinions. When administrators provide a framework for principled decision-making, the result will be to diminish the importance of judicial review by enhancing the integrity of the administrative process and to improve the quality of judicial review in those cases were judicial review is sought.

*Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 F.2d 584, 597 (D.C.Cir. 1971).

Here, the PBGC restored annual funding obligations totalling more than two hundred million dollars to LTV Steel, a Chapter 11 debtor, without ascertainable standards, an exploration of all the relevant facts, and adequate procedures for factfinding and notice. For these reasons and those stated above, the PBGC's decision to restore the Plans cannot be upheld on this administrative record, and its motion for summary judgment is denied. Since the agency's

decision is not sustainable on the administrative record, the appropriate remedy is to vacate the restoration decision and remand the matter to the PBGC for further consideration consistent with this opinion. *Vermont Yankee*, 435 U.S. at 549, 98 S.Ct. at 1214; *Camp v. Pitts*, 411 U.S. at 143, 93 S.Ct. at 1244.

■ Today's decision holds that the PBGC cannot base restoration simply upon LTV's adoption of pension arrangements pursuant to the 1987 collective bargaining agreement. There is, however, support in the legislative history of Title IV and the language of the statute that would support restoration on the basis of LTV's ability to fund the Plans. The PBGC may, therefore, desire to seek to establish such ability to fund, not on the Record as presently constituted, but by trial *de novo* on the issue of LTV Steel's improved financial circumstances.

Upon the findings and conclusions set forth above, LTV's application for an order enforcing the automatic stay is denied, as is the PBGC's motion for summary judgment. The Restoration Notice is hereby vacated. The parties are directed to confer and arrange with chambers a conference for further proceedings on this matter.

IT IS SO ORDERED.